Sandra Lou SOUTHERLAND, Individually and as guardian of Roger Wayne Southerland, Plaintiffs,

v.

COUNTY OF OAKLAND, a corporate body politic, Frank Irons, Oakland County Sheriff, and William Elliott, jointly and severally, Defendants.

Civ. No. 39760.

United States District Court, E. D. Michigan, S. D.

Jan. 31, 1978.

Richard L. Wolk, Detroit, Mich., for plaintiffs.

John F. Allen, Troy, Mich., Robert N. Rosenberg, Asst. Atty. Gen., State of Michigan, Lansing, Mich., for defendants.

## MEMORANDUM OPINION

DeMASCIO, District Judge.

The plaintiff filed this action individually and as guardian for her husband and children seeking damages for injuries her husband Roger Southerland sustained during a confrontation with one of the defendants, a member of the Oakland County Sheriff's Department. During that confrontation on January 2, 1971, Roger Southerland was struck on the side of his head with a .357 Magnum revolver by defendant William Elliott. The weapon discharged and a bullet penetrated Southerland's skull. Mr. Southerland was never again ambulatory and remains bedridden and confined in a state operated facility.

Plaintiff's complaint was set for trial on August 8, 1974. On that day a jury was empaneled and plaintiff's counsel made an opening statement. The following day, August 9, 1974, the court granted defendants' motion for mistrial after one juror announced that she could not give the defendant a fair and impartial trial. The parties thereafter agreed to settle the cause in the amount of $500,000. The details of this settlement agreement were placed in the record and, on August 14, 1974, the court entered a consent judgment prepared by the parties.

The representations made in open court by plaintiffs' attorney, Richard Wolk, regarding the settlement are the subject of the pending dispute. The Michigan Department of Social Services (MDSS) intervened in this action by filing a "Motion for Relief from Judgment" alleging that Mr. Wolk committed a fraud upon the court, the MDSS, and the defendants. MDSS alleges that it notified plaintiffs' attorney of its subrogation rights five months prior to the entry of the consent judgment and that, two months prior to the entry of the consent judgment, an employee of the State's Medicaid Fiscal Management Division sent plaintiffs' attorney a detailed record of the Medicaid payments made by it on behalf of Mr. Southerland. MDSS further alleges that plaintiffs' attorney acknowledged that he would protect MDSS' claim, but that,

after promising the court and the parties that he would personally pay said claim, he has failed to do so. On April 8, 1977 we ordered an evidentiary hearing on the allegations made by the MDSS for the purpose of investigating the alleged fraud (Memorandum and Order, April 8, 1977). The gravity of these allegations now necessitates a detailed discussion of the facts developed at that evidentiary hearing.

The parties had advised the court in chambers that they had settled the case and Mr. Wolk indicated that he had taken plaintiff's case for a contingency fee of 50 percent. When the settlement agreement was spread on the record, counsel for defendants, James Allen, raised the issue of allocating part of the settlement funds to Mrs. Southerland as guardian of her two minor children and her injured husband, Mr. Southerland. Mr. Wolk then indicated that the amount of $15,000 would be allocated for each child, but sought to only allocate a nominal amount for Mr. Southerland. He explained:

> And with respect to this last subject, we would hope that if it becomes necessary to set aside any funds as the guardian of Roger, that it be very minimal because frankly, I don't know that any good purpose would be served in so doing. (Tr., August 9, 1974 at p. 4).

Mr. Wolk further developed this point by questioning his client:

> Q. Now, Mrs. Southerland, you understand that you are going to have roughly $250,000 available to you after these proceedings, which I understand you are going to invest it, is that correct?
>
> A. Yes sir, I am.
>
> Q. And do I understand also that Roger is being taken care of as best he can be, under the circumstances; do you feel that there is anything that could be done in the way of giving him any money that would in any way help his situation?
>
> A. No, he's getting the best he can right now.

> Q. Are you willing, as his wife, if something should occur and you felt it would be in his interest, are you planning on making whatever money available for that?
>
> A. Yes. (Tr. at p. 7–8).

Thus, it was clear that counsel wished to allocate to plaintiff individually as much of the settlement as possible, with the understanding that, when necessary, she would use the money and income derived from investments of the money for the care and benefit of her husband. When Mr. Allen indicated he did not have any questions, the court inquired whether Mrs. Southerland understood the consequences of a lien which MDSS had on the judgment, but was interrupted by Mr. Wolk:

> THE COURT: Mrs. Southerland, you understand that there is a hospital bill or something that must be paid?
>
> THE WITNESS: Yes, I do.
>
> THE COURT: And that has to be deducted, I suppose, unless your attorneys can work something out?
>
> MR. WOLK: I'm going to take care of that myself. That will not be her obligation.
>
> THE COURT: Then it is net $250,000 to her?
>
> MR. WOLK: That's correct. (Id. at 9).

With Mr. Wolk's assurance that his client would net $250,000 and that he would absorb the expenses of litigation and would pay the MDSS lien, the court reluctantly approved the settlement:

> THE COURT: All right. The court has no objection to the settlement. I do not know what else I can do. I have indicated to her, and I think probably you have, Mr. Wolk, that her chances are better than not of getting more. And if she still wants to settle, I have no objection to it. And counsel will prepare the necessary papers.
>
> MR. ALLEN: The allocation of funds, your Honor?
>
> THE COURT: That is up to counsel. I am only concerned that she gets a net of $250,000 and Mr. Wolk assured me he will not deduct the expenses from

her. And whatever he pays the hospital is his business and whatever he allocates would be his business and Mrs. Southerland's business. But you can do that in your office. Id. at 11.

The consent judgment, as drafted by the attorneys, provided for an allocation of $15,000 for each child and $1,000 for Mr. Southerland. Based on the representations made in open court, the court approved the judgment.

The MDSS has been attempting to collect the amount of its lien for over two and one-half years. Richard Wolk was notified on March 11, 1974 that MDSS was paying medical benefits to Roger Southerland and had an interest in this litigation. (Movants' Ex. 1). On June 13, 1974, he was supplied copies of records of Medicaid payments. James Allen testified, consistent with the record, that Mr. Wolk agreed to pay the MDSS lien (Tr. April 25, 1977 at 32). He further testified to an encounter with Mr. Wolk, on August 9, 1974, which occurred while they were leaving the courtroom after placing the settlement on the record:

We left the courtroom. We went out. I indicated that I would prepare the consent judgment which was to be entered pursuant to the testimony given in court. I also indicated that I was going to put the State of Michigan's name on the $500,000 draft so that it would reflect the name of Sandra Lou Southerland, Sandra Lou Southerland in the fiduciary capacity for the minor children and for injured Roger, Mr. Wolk, her attorney, and the State of Michigan. Mr. Wolk asked me if I, in light of what had transpired in court, if I couldn't leave the State of Michigan off. I said very formally—I said no that was not a decision that I could make. I would have to go back to my insurance company and it would be their decision. (Tr. April 25, 1977).

Mr. Allen then elaborated on subsequent events:

They [the insurance company] told me that yes, they * * * would leave the State of Michigan's name off the draft based upon my indication to them of

what had occurred in court and what Mr. Wolk had said on the record to the court. And further, they did require that he write a letter to me besides the court record. So, I called Mr. Wolk and told him that if he wrote me a letter, just explaining that he was going to assume responsibility for the State of Michigan and whatever lien they might have that I had the permission of my company to prepare the draft as indicated previously, except that the State of Michigan's name would not be on the draft. The letter was sent to me. The draft was prepared in the manner in which I previously indicated, without the State of Michigan, and sent to Mr. Wolk. (Id. at 33–4).

Mr. Allen reiterated this account of the events resulting in a letter from Mr. Wolk to him when pressed by Mr. Wolk on cross-examination. (Id. at 61–2.) This letter, dated August 16, 1974 stated:

In response to your request with regard to the claim of the State of Michigan, you are hereby advised that I have been authorized by my client and I do accept and assume the responsibility of the lien of the State of Michigan (Medicaid) in regard to its claim in these proceedings. Accordingly, it will not be necessary to include their name on the draft. (Movants Ex. 3.)

Having represented to the court that he would pay the Medicaid lien and having reiterated that representation to Mr. Allen, Mr. Wolk refused to make such payment and to this date continues to refuse. Larry Ellis, supervisor of the Third Party Liability Section of the Bureau of Medical Assistance, testified that on August 19, 1974 he met with Mr. Wolk to discuss payment, and Mr. Wolk indicated that by approving the consent judgment's allocation of $1,000 for Mr. Southerland, the court was only permitting $1,000 to be used for payment of the MDSS lien. (Id. at 70, 79–80.)

Thus, it is clear that when Mr. Wolk represented to the court that no useful purpose would be served by allocating more than a minimal amount for Mr. Southerland because his wife was willing to use the

money for his care when necessary, he did so fraudulently, for his real purpose was to obtain a court order which he could misrepresent to MDSS as a limitation of the amount payable toward its lien. Moreover, when Mr. Wolk represented to the court that he would pay the Medicaid lien, he did so falsely, for he never intended to pay it. This conclusion is reinforced by the testimony of Mrs. Southerland. She testified that Mr. Wolk told her that the $1,000 was allocated for the MDSS lien on the same day on which the settlement was placed on the record. (Tr. Apr. 26, 1977, at 152–57.) Mr. Wolk's misrepresentations to the court are not confined to the Medicaid lien. On August 9, 1974, prior to spreading the settlement agreement on the record in open court, Mr. Wolk assured the court that Mrs. Southerland would net $250,000 and that he would assume all the litigation expenses. (Tr. Aug. 9, 1974, at 11.) Nevertheless, Mrs. Southerland personally paid $225.00 in expert witness fees. Not only has Mr. Wolk not reimbursed her, but he has deducted from her $250,000 the sum of $1,200.00 for expenses. (Tr. Apr. 26, 1977 at 139–40.)

The evidentiary hearing also raised questions concerning the propriety of Mr. Wolk's fee. On March 8, 1976, Mrs. Southerland wrote to the court complaining that Mr. Wolk took half of the settlement after previously agreeing to a fee of one-third. (Movants' Ex. 4.) One week later, March 15, 1976, she wrote another letter explaining that the matter had been resolved to her satisfaction. (Movants' Ex. 5.) Mrs. Southerland testified that she does not remember signing a written agreement for one-half, but that Mr. Wolk told her that she did. She never received a copy of the agreement, and Mr. Wolk indicated to her that he had lost his copy. Nevertheless, after discussing the matter with Mr. Wolk she testified that she was satisfied that one-half was the proper fee. (Tr. April 26, 1977, at 142–45.) Although this evidence concerning the fee is insufficient to establish that Mr. Wolk defrauded his client, it is sufficiently suspicious to corroborate our conclusion that Mr. Wolk acted fraudulently in his handling of the Medicaid lien.

Thus, we find as a matter of fact that Mr. Wolk never intended to pay the MDSS lien and embarked upon the following scheme. He represented to the court that he would pay the lien, and through his fraudulent misrepresentations induced the court to approve a consent judgment which allocated only $1,000 for Roger Southerland, and then misrepresented the effect of that judgment to MDSS as a limitation upon its lien. In order to succeed in his scheme, Mr. Wolk had to be certain that the State of Michigan would be omitted as a payee on the draft. He requested Mr. Allen not to include the State of Michigan on the draft by assuring Mr. Allen that he would pay the MDSS lien as he represented to the court he would. He thereafter mailed a letter to Mr. Allen reiterating these assurances. This letter (Movants' Ex. 3) was required by Mr. Allen's clients as a prerequisite to omitting the State of Michigan as a payee on the draft.

Mr. Wolk presented a different view of the events surrounding the settlement of this cause. He testified that Mr. Allen suggested initially that the MDSS lien could be compromised for as little as $5,000 and possibly waived entirely. Tr. April 26, 1977 at 166–68. He further testified, after the settlement was placed on the record, Mr. Allen told him that he should allocate only $1,000 to Mr. Southerland in order to limit the MDSS lien. Id. at 160–70. Mr. Wolk explained further that he wrote his letter (Movants' Ex. 3) to Mr. Allen, following a telephone request for it. He implied that the initiative for the letter came from Mr. Allen and was induced by Mr. Allen's concern for defendant Elliott's dissatisfaction with the settlement. Id. at 173–75.

We find Mr. Wolk's testimony so incredible we are obliged to comment upon it. He attacks Mr. Allen's credibility by suggesting that Mr. Allen fears that "if he speaks truthfully, he and his client might also become a target for redress of the department's claim." (Respondent's closing argument at 5.) This is completely absurd. The MDSS lien is against the judgment and Mr.

Wolk offers no authority, and we cannot find any, that would support an action by MDSS against Mr. Allen or his client. Mr. Wolk forgets that when Mr. Allen first suggested that there be an allocation of the settlement funds, he had no interest in the amounts allocated. At the settlement hearing Mr. Allen said:

One more thing, your Honor. I think that there should be an allocation of funds to Sandra Lou Southerland as guardian of Roger Southerland. It should be some sort of allocation to her. *And of course, I have no objection to whatever amount it may be or whatever your Honor and counsel determines between you.* And then, of course, the balance would go to Sandra Lou Southerland in her individual capacity. (Tr. Aug. 9, 1974 at 4.) (Emphasis added.)

Moreover, there is no conceivable reason for Mr. Allen to have acted as Mr. Wolk claims he did. We find it inconceivable that Mr. Allen would have suggested the $1,000 allocation to Roger Southerland. His concern was to obtain the most favorable disposition of the case possible for his clients. He determined that a settlement of $500,000 was in his clients' interest. The amount of the total settlement would not be affected by the method of allocation. It is common practice for defense counsel to suggest an allocation of the settlement funds to each plaintiff so that a release may be obtained from each and fully protect the defendant from further litigation. Neither Mr. Allen nor his client had any interest whatsoever in how the settlement fund was divided. Mr. Allen so testified in the hearing concluded on April 25, 1977 (Tr. April 25, 1977 at p. 29). It is quite astonishing that Mr. Wolk could even suggest that Mr. Allen proposed this scheme. It would indicate that, after having represented to the court that the reason for allocating $1,000 to Mr. Southerland was to provide Mrs. Southerland with the bulk of the settlement to use for his care, Mr. Wolk willingly agreed to deceive the court five days later when the court entered the consent judgment. It would also indicate that Mr. Wolk willingly took advantage of Mr. Allen's fraud upon

the court by suggesting to Mr. Ellis that the judgment of $1,000 for Mr. Southerland limited the amount available for payment of the MDSS lien. It is incredible that Mr. Wolk could even entertain such a dubious proposition without researching the point since MDSS, at the time, was not even a party to the litigation. We are persuaded that Mr. Allen is a neutral witness in these proceedings. There is no motivation whatsoever for him to take the oath and then commit perjury.

 We have already determined that a court has inherent power to set aside a judgment for fraud practiced upon it. (See this court's Memorandum and Order, April 8, 1977 at 4.) We pointed out that in *Universal Oil Products Company v. Root Refining Company*, 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946) the Court stated:

The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question. *Hazel-Atlas Company v. Hartford-Empire Company*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250. The power to unearth such a fraud is the power to unearth it effectively.

The court's power to unearth fraud practiced upon it is not limited to the narrow circumstances of bribery or corruption of the court or jury. *See* 7 Moore's Federal Practice § 60.33 at 512. In *Hazel-Atlas Glass Company v. Hartford-Empire Company*, 322 U.S. 238, 64 S.Ct. 997, 90 L.Ed. 1447 (1944) the court held that the Circuit Court of Appeals had inherent power to correct the fraud that had been practiced upon it:

Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the patent

, office but the Circuit Court of Appeals. 322 U.S. at 245–46, 64 S.Ct. at 1001.[1]

Mr. Wolk's fraudulent statements to the court are particularly disturbing because he is an attorney and as such, an officer of the court obliged to act forthrightly at all times.

> While he should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary, his loyalty to the court, as an officer thereof, demands integrity and honest dealings with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court. 7 Moore's Federal Practice at 513 (1975). (Citations omitted).

Mr. Wolk argues that MDSS is guilty of negligence and laches, but these cannot bar relief where a fraud has been perpetrated on the court. *Hazel-Atlas Glass Company v. Hartford-Empire Company, supra* at 246, 64 S.Ct. 997. The fraud in the case at bar is far more aggravated than that perpetrated in *Hazel-Atlas.* In *Hazel-Atlas* the fraud was undertaken for the benefit of the client, while here Mr. Wolk's fraud was for his sole benefit and undertaken at the expense of his client. The attorney general contends, and we agree, that Mr. Wolk's actions present a carefully planned scheme calculated to deceive the court, the MDSS, defense counsel and his client. The judgment must be set aside and a new one entered.

■ Several other matters have surfaced from the evidence produced at the hearing on MDSS' motion. First, we are obliged to examine Mr. Wolk's conduct in the light of our own local court rules. Local Court Rule VI(b)(4) subjects to disciplinary proceedings a member of the bar of this court

> who is guilty of conduct unbecoming a member of the bar of this court. Such conduct shall be deemed to consist of fraud, deceit, malpractice or violation of the canons of ethics of the American Bar Association or of the Michigan State Bar Association.

Equally disturbing is the apparent applicability of this rule to the quality of representation Mr. Wolk provided his client. Mr. Wolk indicated several times during the evidentiary hearing and testified under oath that he never researched the effect the settlement of the case would have on the Southerlands' continued eligibility for Medicaid. He first learned that Mrs. Southerland would be ineligible for further payments when MDSS terminated benefits. Mr. Wolk's failure to inquire into this issue resulted in his client's acceptance of a settlement under the erroneous belief that she would continue to receive Medicaid benefits. His actions clearly give rise to a cause of action against him for malpractice, should his client wish to pursue it. The handling of a case in this manner is clearly conduct unbecoming a member of the bar of this court as defined in Local Rule VI(b)(4). Accordingly, we are obliged to refer this matter to the Chief Judge to invoke the disciplinary procedures provided in Local Rule VI(d).[2]

■ Next, we cannot overlook the fact that Mr. Wolk accepted 50 percent of the settlement as his contingency fee in this case. When the settlement was placed in the record, the court, although not approving the fee arrangement, did not object to it. Nevertheless, the court was concerned that Mr. Wolk's fee was exorbitant. Thus, the court did its best to discourage Mrs. Southerland from accepting the settlement, and when she insisted, the court insisted that Mrs. Southerland net no less than $250,000. The court believed that she would since Mr. Wolk had given his assurances that he would absorb the expenses of

---

1. It is important to note that although four Justices dissented, the Court was unanimous in condemning the odious attempt at subverting the administration of justice. 322 U.S. at 251, 64 S.Ct. 997 (Roberts, J. dissenting).

2. In examining this matter the Chief Judge may observe, as we have, that Mr. Wolk's testimony given under oath may well have violated 18 U.S.C. § 1621. The Chief Judge may further observe from the testimony of Mr. Allen that Mr. Wolk's letter (Movants' Ex. 3), was a mailing which violated 18 U.S.C. § 1341.

litigation and would pay the MDSS lien. The court elaborated on its concern at the hearing on the MDSS motion:

I want to be sure that nobody here, especially Mrs. Southerland, would think the court approved a $250,000 fee. That would be 50 percent, and I do not know what kind of contract Mr. Wolk had with Mrs. Southerland to receive 50 percent of the settlement. (Tr. April 25, 1977 at 31–32.)

In light of the evidence developed at the hearing, we can no longer refrain from objecting to the 50 percent fee. When a settlement is approved, the court has authority to decide matters incidental to the main controversy including attorneys fees and costs and the manner in which the funds are to be distributed. The court has an obligation to set aside any fee which is excessive and unethical. *Bennett v. Home Insurance Company of New York*, 347 F.Supp. 451 (S.D.Fla.1972). To determine an appropriate fee, we have considered all of the criteria enumerated in D.R. 2–106(B), Code of Professional Responsibility. We have also taken into account that Mr. Wolk practiced a fraud upon the court and did not provide his client with competent service. The benefit which he gained for his client by negotiating the settlement has been offset to a marked degree by his failure to inform her of the effect the settlement would have on her eligibility for future Medicaid benefits. Contingency fees in personal injury cases are now regulated by the Michigan General Court Rules. G.C.R. 928.2 provides maximum percentages for contingency fees. Two alternative formulas are provided, neither of which permits the charging of a 50 percent fee. Application of the formula provided in G.C.R. 928.2 would give Mr. Wolk a total fee of $115,250. We recognize, however, that the Michigan General Court Rules are not controlling because this case was concluded before May 3, 1975, the effective date of the rule. The rules do, however, indicate the generally accepted view of a reasonable fee and the general practice now in effect. The Michigan General Court Rules (G.C.R.

928.6) also provide that all contingency fee arrangements shall be reduced to writing and a copy provided the client. Mr. Wolk admits that he never provided a copy of the written agreement to Mrs. Southerland, and Mrs. Southerland does not remember signing any agreement. Similarly, Mr. Wolk is not bound by G.C.R. 928.6, but it does demonstrate the irregularity of his procedure.

Having considered all of these factors, the court concludes that a fee of 50 percent in this case is unconscionable and unethical. We further conclude that such a fee would leave a lawyer of ordinary prudence with a firm conviction that it is in excess of a reasonable fee. *See* D.R. 2–106(B). The court further concludes that a reasonable fee in this case should not exceed one-third of the settlement amount, the practice in the State of Michigan in effect prior to the adoption of the General Court Rules.

■ Finally, in the "Motion for Relief from Judgment" the State Attorney General makes request for interest and the cost incurred in the filing of this motion. Where a fraud upon the court has been demonstrated, dominating reasons of justice permit the assessment of the entire cost of the proceedings, including attorneys fees against the guilty party. *Universal Oil Company, supra*, at 580, 66 S.Ct. 1176. Therefore, upon a proper motion filed by the Attorney General, accompanied by supporting affidavits, the court will assess such costs against Mr. Wolk.

IT IS SO ORDERED.