The **SYNANON CHURCH, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 82–2303.**

United States District Court, District of Columbia.

Feb. 9, 1984.

As Corrected March 8, 1984.

Philip C. Bourdette of Bourdette, Benjamin & Weill, Washington, D.C., and Geoffrey P. Gitner of Scherr, Krebs & Gitner, Washington, D.C., for plaintiff.

Thomas M. Lawler and Francis G. Hertz, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant. Of counsel to defendant: Stanley S. Harris, and his successor, Joseph E. DiGenova, U.S. Attys., Washington, D.C., for the District of Columbia.

CHARLES R. RICHEY, District Judge.

## INTRODUCTION

Synanon filed a complaint for declaratory relief in August 1982, pursuant to the Internal Revenue Code of 1954, 26 U.S.C. § 7428, alleging, *inter alia,* that the Internal Revenue Service ("IRS") erroneously revoked its tax-exempt status under § 501(c)(3) for the two fiscal years ending

August 31, 1977, and August 31, 1978.[1] Since that time, the parties have filed reams of motions, memoranda, exhibits, and affidavits, some of which remain before this court for consideration, but which for the most part it will not be necessary to decide in view of the result herein. Those outstanding motions include cross motions for summary judgment, defendant's second motion for summary judgment, defendant's motion to dismiss with prejudice, and a variety of motions relating to discovery and evidentiary matters. For the reasons set forth below, the court has determined that this case will be dismissed with prejudice for plaintiff's fraud upon the court, and judgment will be entered in favor of the United States.

## BACKGROUND

Synanon was founded in 1958 by Charles E. Dederich, allegedly to rehabilitate drug addicts and to engage in related research and public education. Its application for tax-exempt status was granted in July 1960 because it was "organized and operated exclusively for charitable purposes" (IX at 369)[2] and therefore qualified under 26 U.S.C. § 501(c)(3), which excludes from taxation:

> Corporations ... organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation ..., and which does not participate in, or intervene in ... any political campaign on behalf of any candidate for public office.

Synanon operated as a residential facility and relied on group encounter sessions, known as "games," for part of its therapy. (Plaintiff's Statement of Material Facts, Vol. III.) Beginning in 1967, non-addicts were also admitted to Synanon as residents, and were known as either "squares" or "lifestylers" depending on whether they worked within Synanon itself or at outside jobs. Lifestylers paid to live in Synanon facilities. (Defendant's Statement of Material Facts at 4–5.) In 1974, Synanon's chief counsel proposed "calling ourselves a religion," to reflect what had "been so for a long time," (IX at 56) and won the Board of Directors' approval. Synanon's Articles of Incorporation were amended in September 1975 to include "religious purposes." (IX at 63.)

Over the years, Synanon became involved in a wide variety of endeavors other than strictly residential rehabilitation of addicts. In addition to its inclusion of lifestylers and squares, these activities included ADGAP, an advertising gift business; the Synanon Distribution Network, which solicited goods from farmers and the business community; real estate development; investment counseling; and the training and maintenance of security forces, among others. (*See* Defendant's Statement of Material Facts.) Synanon claims that these were all designed to enhance its educational and rehabilitative objectives, while the government contends that they are evidence of its ineligibility for tax exemption. The government bases its position on three arguments, two statutory and one extrastatutory. First, it claims that Synanon is not "organized and operated exclusively for religious, charitable, scientific, ... or educational purposes," as required by § 501(c)(3). The United States further claims that Synanon fails to qualify under § 501(c)(3) because its net earnings inure to the benefit of private individuals. Finally,

---

1. Synanon originally sought a declaratory judgment that it was entitled to tax-exempt status for all years after fiscal 1976. The Court decided on March 2, 1983, that it lacked subject matter jurisdiction over the claims for all years subsequent to fiscal 1978 because plaintiff had not exhausted its administrative remedies. 557

F.Supp. 1329. The Court has also decided previously that Synanon is not entitled to a jury trial. Order of March 2, 1983. 557 F.Supp. 1329.

2. Roman numerals refer to the volume numbers of defendant's exhibits filed in support of its summary judgment and dismissal motions.

the government relies on *Bob Jones University v. United States*, —— U.S. ——, 103 S.Ct. 2017, 2028–29, 76 L.Ed.2d 157 (1983), for the proposition that a tax-exempt organization must serve a public benefit, in addition to satisfying the statutory criteria. The government argues that Synanon's violent and illegal activities bar tax exemption under the *Bob Jones* test. Although the government vigorously disputes Synanon's self-characterization as a religion, the decision herein does not depend on the resolution of that controversy. Even a bona fide church that failed the "exclusive operation," "private inurement," or *Bob Jones* test would not be eligible for tax exemption. *Incorporated Trustees of the Gospel Worker Society v. United States*, 510 F.Supp. 374, 378 n. 12 (D.D.C.), *aff'd*, 672 F.2d 894 (D.C.Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1982).

## I. IT IS NOT NECESSARY TO REACH DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT IN LIGHT OF THE RESULT HEREIN BUT IT CANNOT BE DISPUTED THAT SUBSTANTIAL EVIDENCE SUPPORTS THEIR ALLEGATIONS THAT PLAINTIFF HAS A POLICY OF COMMITTING HEINOUS ACTS OF PHYSICAL VIOLENCE AGAINST ITS PERCEIVED ENEMIES

The government has advanced three theories under which it claims entitlement to summary judgment: exclusive operation, private inurement, and *Bob Jones'* "public policy" test. The voluminous exhibits it has submitted in support of its motions consist largely of Synanon's own records and transcripts of taped statements by Synanon's leaders. These exhibits raise serious questions concerning Synanon's financial operations and create a chilling portrait of an organization that advocates terror and violence. Approximately seven million dollars of corporate money was distributed to Synanon officials during the two years at issue in this lawsuit, purportedly as salaries, bonuses, and consultation fees. Of this sum, over two million dollars went to Charles Dederich and his family. (Defendant's Statement of Material Facts at 35–47.) Top Synanon officials received non-cash benefits as well, including a residence known as "Home Place" in Badger, California (*id.* at 26–28); access to a fleet of recreational vehicles, including boats, planes, and motorcycles (*id.* at 10–11, 26–27); brokerage services (*id.* at 48–51); and a two-month trip to Europe (*id.* at 134–35).

More disturbing than this evidence of fiscal improprieties, however, are the repeated attacks and threats of violence committed by Synanon members against those perceived as enemies of the organization. These incidents are tied to Synanon's leaders, at the very least by rhetoric and sometimes by participation or ratification as well. (*See* Defendant's Statement of Material Facts at 66–100.) In 1977, for example, Charles Dederich's "New Religious Posture" speech warned "Don't mess with us. You can get killed dead. Physically dead." (Vol. I at 4.) Dederich was later convicted on a plea of nolo contendere, along with two other Synanon members, of conspiracy to murder Paul Morantz. Mr. Morantz, an attorney who filed suit against Synanon on behalf of two former members, had been bitten by a four-foot rattlesnake when he reached into his home mailbox in October 1978. (*Id.* at 98–100.) While Synanon officials were in Formia, Italy, in the summer of 1978, phone calls were made back to the United States to try to arrange Morantz' assassination. (Fleishman affidavit at 5; Mullen affidavit at 2; Arbiter affidavit at 1–2.) Synanon organized groups called the "Imperial Marines" and the "National Guard," and called for "Holy War" against its enemies. (Defendant's Statement of Material Facts at 68–74, 108–09.) Synanon leaders and members have been linked with a large number of beatings and other acts of physical violence, and some have been convicted. (*See id.;* Fleishman, Mullen, and Arbiter affidavits.)

Despite the seriousness of these allegations and substantial supporting evidence, plaintiff maintains that summary judgment is precluded because genuine issues of ma-

terial fact remain. Synanon relies principally on two arguments: first, that in Synanon's "gaming community," statements cannot be taken at face value but rather are often intended to polarize, exaggerate, distort, and outrage (Plaintiff's Statement of Material Facts, Vol. III); and, second, that any violence that occurred was not a product of the organization's policy but of individual actors, albeit in some instances high-ranking Synanon officials. The government vigorously disputes both of these contentions. Plaintiff also objects to the government's characterization of its financial operations, although it does not challenge the accuracy of the material facts.

It is fundamental that a party cannot avoid summary judgment by mere conclusory denials in its pleadings. *Tarpley v. Greene,* 684 F.2d 1, 6–7 (D.C.Cir.1982); *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051, 1054 n. 7 (D.C. Cir.1981). In addition, Local Rule 1–9(h) requires that the party opposing a summary judgment motion file a "concise statement of genuine issues" and provides that the court may take the moving party's factual claims as true without such a statement. *Gardels v. CIA,* 637 F.2d 770, 773 (D.C.Cir.1980). The plaintiff here has attempted to contravert defendant's evidence with its "gaming" explanation, its denial of corporate complicity in acts of violence, and its "deferred compensation" explanation for the distribution of substantial corporate assets to its members, and has submitted a voluminous statement and affidavits to that effect. It is not necessary to decide whether these self-serving affidavits are sufficient to withstand defendant's motions for summary judgment, however, in light of the result reached herein on other grounds.

## II. THIS CASE MUST BE DISMISSED BECAUSE OF SYNANON'S FRAUD UPON THE COURT

■ Although summary judgment is not necessary given the posture of this case, the action must be dismissed due to plaintiff's wilful, systematic, and extensive destruction and alteration of documents and tapes relevant to a determination of Synanon's tax-exempt status. This "egregious misconduct" amounts to "a scheme to interfere with the judicial machinery performing the task of impartial adjudication, ... by preventing the opposing counsel from fairly presenting ... [its] case or defense." *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 195 (8th Cir. 1976). More than mere fraud between the parties, or an isolated instance of perjury, plaintiff has compounded its "unconscionable plan," *England v. Doyle,* 281 F.2d 304, 309 (9th Cir.1960), by its indisputable misconduct before this court, as outlined below.

A. *Plaintiff Is Collaterally Estopped From Denying Its Systematic Destruction and Alteration of Records by the* Bernstein *Decision of Judge Braman of District of Columbia Superior Court*

In *Synanon Foundation, Inc. v. Bernstein, et al.,* Superior Court of the District of Columbia, Civil Action No. 7189–78, Judge Braman found by clear and convincing evidence that Synanon engaged in a "wilful, deliberate and purposeful scheme to ... destroy extensive amounts of evidence and discoverable materials which probably would have had a dispositive bearing upon Synanon's ... non-profit status .... The scheme further had as its purpose to cover up and conceal this destruction of evidence and discoverable materials ..." (T. at 42.)[3] The destruction and alteration of tapes, a computer inventory, and transcript index was aimed at "materials not only related to violence, but also to money, to sexual subjects, to guns, and to others matters." (T. at 13). This destruction and cover-up were conducted under the direction of Steve Simon, Synanon's "Archivist," (T. at 13) with the "knowledge and approval of ... [Synanon's] legal department," including Philip Bourdette, its gen-

---

**3.** Citations are to the transcript of the Superior Court hearing of October 12, 1983.

eral counsel, Board of Directors' member, and Secretary.[4] (T. at 15, 39). Judge Braman found that the destruction took place in three "waves:" the first beginning in October 1978 and continuing through December (T. at 13–15); the second in 1979 (T. at 15–17); and a third in 1980 (T. at 17).

■ The doctrine of collateral estoppel bars relitigation of an issue by the losing party once it has been actually and necessarily determined, expressly or by implication, by a court of competent jurisdiction. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); *Jack Faucett Associates, Inc. v. AT & T Co.,* 566 F.Supp. 296, 298–99 (D.D.C.1983). The doctrine will be applied only when the issue is "substantially the same as the issue previously litigated," *Schneider v. Lockheed Aircraft Corp.,* 658 F.2d 835, 851 (D.C.Cir.1981), *cert. denied,* 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982); *Carr v. District of Columbia,* 646 F.2d 599, 608 n. 47 (D.C.Cir. 1980), and when the party who is estopped had a full and fair opportunity to litigate, *id.* at 602.

■ The prerequisites for invoking collateral estoppel are satisfied here. The court in *Bernstein* was faced with the question of whether Synanon was a "nonprofit corporation" under the District of Columbia zoning laws, and therefore examined "whether its corporate policy contravened fundamental public law policy" in light of "the claimed illegality of Synanon's corporate policy ... of terror and violence." (T. at 5.) The defendant also claimed that Synanon was not "non-profit"

because "the corporate monies were deflected to private usages." (T. at 6.) These issues are substantially identical to the government's arguments for summary judgment against Synanon: that its corporate policy of violence violates the public policy standard of *Bob Jones* as well as the "exclusive operation" test of § 501(c)(3), and that private inurement bars tax exemption under § 501(c)(3). The *Bernstein* court also devoted meticulous attention to the issue of plaintiff's destruction and alteration of documents and tapes. (T. at 11–44.) It was on the basis of that destruction, *not* because of Synanon's alleged corporate policies of violence or its use of funds, that Judge Braman decided to dismiss *Bernstein.* (T. at 11, 42.)

■ Before rendering his decision in *Bernstein,* Judge Braman heard eleven witnesses and received seventy-eight exhibits into evidence over twelve days of hearings; eight of the eleven witnesses were called by Synanon. Substantial discovery had occurred over the preceding five years since Synanon's filing its complaint. (Memorandum for the United States in Reply to Synanon's Opposition to the Government's Second Motion for Summary Judgment at 18.) This amounts to a full and fair opportunity to litigate, despite Synanon's frivolous protests.[5] *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971). Synanon clearly had the incentive to litigate the *Bernstein* case and was hampered only by the choice of its own top officials to invoke their fifth amendment privilege against self-incrimination rather than to testify. (T. at 11–12.)[6]

---

4. Philip Bourdette testified and invoked his fifth amendment privilege against self-incrimination before Judge Braman. The judge's findings indicate that Mr. Bourdette both committed and suborned perjury. (T. at 15, 41.) He has informed this Court that he would also be a witness in this case.

5. Synanon argues that it was unable to present its case fully and fairly because of government misconduct in commingling civil and criminal investigations, coercing potential witnesses, and

preventing its access to documents. (Memorandum in Opposition to Defendant's Second Motion for Summary Judgment at 22–23.) The Court finds no evidence in support of these allegations, which are discussed more fully *infra.*

6. Those invoking the fifth amendment included Philip Bourdette and his wife Miriam, a Synanon legal department official; Cecelia Dederich, daughter of the founder and chairman of the board; and Steve Simon, Synanon's Archivist.

 Synanon's other objections to the application of collateral estoppel are without merit. First, the fact that *Bernstein* has been appealed is without significance for collateral estoppel. The rule for both District of Columbia and federal courts is that the pendency of an appeal does not impair the conclusiveness of a final judgment. *Mahoney v. Campbell*, 209 A.2d 791, 794 (D.C.1965). *See also Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 61 S.Ct. 513, 85 L.Ed. 725 (1941). It is also clear that a judgment of the Superior Court of the District of Columbia is entitled to full faith and credit under 28 U.S.C. § 1738. *Carr*, 646 F.2d at 605–07; *see also United States Jaycees v. The Superior Court of the District of Columbia*, 491 F.Supp. 579, 581–82 (D.D.C. 1980). Finally, Synanon offers no persuasive precedents or reasoning to support its argument that the doctrine of collateral estoppel ought not to apply in a tax case. The purposes of the doctrine—conserving judicial resources, protecting adversaries from vexatious litigation, and fostering reliance on prior judicial action by minimizing the possibility of inconsistent decisions—are served by its application here as in other contexts. *See Montana*, 440 U.S. at 153–54, 99 S.Ct. at 973–74.

B. *Synanon's Fraud Upon the Court Mandates the Dismissal of this Case*

 "Fraud upon the court" is a distinct subclass of the broader category of "fraud." Professor Moore's definition has been adopted by a number of courts:

"Fraud upon the court" should, we believe, embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct. Fraud *inter partes*, without more, should not be a fraud upon the court ....

7 Moore's *Federal Practice* ¶ 60.33 (2d ed. 1983), at 60–360 & –361. *See also Kerwit Medical Products, Inc. v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (5th Cir. 1980); *Pfizer*, 538 F.2d at 195; *Kupferman v. Consolidated Research & Manufacturing Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972); *Kenner v. IRS*, 387 F.2d 689 (7th Cir.1968); *Martina Theatre Corp. v. Schine Chain Theatres, Inc.*, 278 F.2d 798 (2d Cir.1960); *Southerland v. County of Oakland*, 77 F.R.D. 727 (E.D.Mich.1978), *aff'd*, 628 F.2d 978 (6th Cir.1980); *Lockwood v. Bowles*, 46 F.R.D. 625 (D.D.C. 1969). Allegations of fraud upon the court arise in two contexts: first, as in this case, before there has been an adjudication, and second, in cases where a party seeks to overturn a final judgment, usually under Fed.R.Civ.P. 60(b). Whenever such a fundamental fraud is uncovered, it "calls for nothing less than a complete denial of relief." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944).

1. *The court invokes its inherent powers to dismiss this case*

[11, 12] A district court has those inherent powers which "are necessary to the exercise of all others." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980), quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). *See also Hazel-Atlas*, 322 U.S. at 245–46, 64 S.Ct. at 1000–1001. They are properly invoked to dismiss Synanon's case to regain its tax-exempt status because Synanon engaged in a "deliberately planned and carefully executed scheme to defraud." *Id.* at 245, 64 S.Ct. at 1001. Its systematic destruction of tapes and alteration of records was contemporaneous with an IRS audit that began in March 1979 and that focused on whether Synanon was a tax-exempt organization. The matters under investigation included the existence of a corporate policy of terror and violence and the diversion of corporate resources for the enrichment of individuals. (*See* Synanon's Complaint at 13; Bourdette affidavit at ¶¶ 5, 8.)

It is material relating to precisely these subjects that Judge Braman found Synanon had deliberately destroyed. (T. at 13.)

Synanon has continued its misconduct and perpetuated this fraud up to the present. First, it filed this lawsuit, having wilfully destroyed the most probative evidence of its true claim to tax-exempt status. Judge Braman's findings directly refute Synanon's innocent explanation for the nonexistence of certain tapes, *i.e.*, that tape erasure was a normal practice within the organization and that tapes have also been lost and/or stolen. Synanon opposes defendant's summary judgment motions by relying on its "gaming" theory and by denying a *corporate* policy of violence, but it has effectively precluded resort to the best evidence: tapes of its high-level meetings. The continuing fraud is demonstrated by other litigation tactics. Synanon sought an admission in October 1982, pursuant to Fed.R.Civ.P. 36, that no relevant information had been denied the IRS (Synanon's First Set of Admissions, 6). Philip Bourdette represented to this court on March 21, 1983, that "[t]here was never, ever any situation where he [the IRS agent] was denied access to anything." (Hearing transcript at 32.) Mr. Bourdette made a similar representation in ¶ 6 of his affidavit filed in May 1983. These statements are disingenuous, at best, given Mr. Bourdette's knowledge that extensive campaigns of destruction had rendered the IRS audit a charade.[7]

In addition to the misconduct detailed above, Synanon, in response to two orders of this court, dated August 17 and October 21, 1983, failed to acknowledge its scheme of targeted destruction and concealment of materials perceived to be damaging. (*See* "Response of Plaintiff to Order of the Court to Produce" dated August 30, 1983, and "Further Response of Plaintiff to Order of the Court to Produce," dated October 25, 1983.) Those orders required *accounting* for destruction if the materials were no longer extant. Synanon cannot complain of lack of specificity in the orders when its own destruction and alterations made greater specificity impossible. Nor can it credibly claim that the government has unfairly introduced new issues with its *Bob Jones* theory and, therefore, is now demanding material previously deemed irrelevant; the issue of a corporate policy of terror and violence was clearly raised from the start of the audit in 1979 as part of the "exclusive operation" inquiry. (Bourdette affidavit at ¶¶ 5, 8.)

The seriousness of Synanon's continuing misconduct is only magnified by the complicity of its legal department.

[W]hile an attorney should represent his client with singular loyalty, that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court.

7 Moore's *Federal Practice* ¶ 60.33, at 60–359.

---

**7.** In addition to the significance of these events in establishing a fraud upon the court, they prompt serious concern over compliance with Federal Rules of Civil Procedure 7 and 11, as amended August 1, 1983. Rule 11 provides that:
[e]very pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record .... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation...: If a pleading motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction ....

This language parallels Rule 26(g) and "brings Rule 11 in line with practice under Rule 37, which allows sanctions for abuses during discovery to be imposed upon the party, the attorney, or both." Fed.R.Civ.P. 11 advisory committee note.

■ In addition, the public interest in conferring the *privilege* of tax exemption—which amounts to a subsidy from the public coffers—only on deserving organizations, demands the drastic sanction of dismissal in this case. *See Bob Jones*, 103 S.Ct. at 2028–29. Granting a tax exemption:

> does not concern only private parties .... Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.

*Hazel-Atlas*, 322 U.S. at 246, 64 S.Ct. at 1001.

A comparison of this case to the leading case on fraud upon the court, *Hazel-Atlas*, is illuminating. 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). There, the plaintiff filed suit for patent infringement and won a judgment, which the defendant later attacked for fraud upon the court. The plaintiff had begun its fraudulent scheme long before the suit was ever filed, as part of its effort to obtain a patent. It had planted an article lauding its innovation in a trade journal under a widely-known signature. After its patent application was granted, it filed suit for infringement and quoted copiously from the article during litigation. Years later, the Supreme Court found that, from the Patent Office, "the trail of fraud continued without break through the District Court and up to the Circuit Court of Appeals. Had the District Court learned of the fraud on the Patent Office at the original infringement trial, it would have been warranted in dismissing ... [the plaintiff's] case." *Id.* at 250, 64 S.Ct. at 1003. Here, the district court *has*

learned of the plaintiff's fraud, on the IRS and on itself, and dismisses the case accordingly.

2. *Dismissal would also be justified under Fed.R.Civ.P. 16(f) or 41(b)*

■ Although the Court relies on its inherent power to dismiss for fraud, it notes that dismissal would also be justified under Rules 16(f) or 41(b)[8] for Synanon's failure to obey its orders of August 17 and October 21, 1983. (*See* discussion *supra*.) Synanon improperly tries to characterize those orders as mere requests for documents under the usual discovery rules. (*See* Memorandum in Support of Plaintiff's Reply in Opposition to Defendant's Second Motion for Summary Judgment.) Clearly, the rules contemplate that, ordinarily, parties will make requests to one another under Rule 34, and resort to motions under Rule 37(a) only when that has failed. Rule 37 goes on to provide for sanctions under sub-paragraphs (b), (c), and (d)—including dismissal—for failure to comply with a discovery order. While a *court* has the power to treat a party's precipitous motion for the production of documents as a mere request under Rule 34—and normally will do so—a *litigant* has no discretion to ignore court orders it considers improvident. The orders of August and October 1983 were issued pursuant to the Court's Rule 16(e) authority to enter pretrial orders, in response to extraordinary allegations of systematic misconduct by the plaintiff in discovery with other litigants in other cases. (*See* Fleishman affidavit.) The plaintiff's utter failure to obey those orders for production and to account fully for destroyed materials would justify dismissal under Rules 16(f) or 41(b) of the Federal Rules of Civil Procedure. While the sanction of dismissal is also one of those available for discovery abuses under Rule 37, its use is

---

**8.** Rule 16(f) provides that "[i]f a party or party's attorney fails to obey a ... pretrial order, or ... fails to participate in good faith, the judge, upon motion or his own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D)."

Rule 41(b) reads in part that "[f]or failure of the plaintiff to ... comply with ... any order of court, a defendant may move for dismissal of an action or of any claim against him."

not necessarily contingent upon a previous Rule 34 request for documents.

## III. SYNANON IS NOT ENTITLED TO DISCOVERY OR RELIEF BASED ON ITS ALLEGATIONS OF SELECTIVE ENFORCEMENT OF THE LAW OR GOVERNMENT MISCONDUCT

Synanon has consistently maintained that it is entitled to relief from, and needs to conduct discovery on, alleged government misconduct, both in revoking its tax exempt status and in defending this lawsuit. The Court finds that these arguments are without merit and, therefore, present no impediment to the dismissal of this case.

### A. *Synanon Has Failed to Present Even a "Colorable Claim" of Selective Enforcement of the Law*

■ Synanon has alleged that it has been discriminatorily subjected to the enforcement of the tax laws and that the government has acted in "bad faith." (Plaintiff's Memorandum of Law Regarding Selective Enforcement of the Law.) Such claims may be raised in a civil case. *See, e.g., Attorney General v. Irish People, Inc.*, 684 F.2d 928 (D.C.Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). *See also Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Even at the discovery phase, however, the party raising a selective enforcement argument must offer a "colorable claim" that 1) it was singled out from those similarly situated, and 2) that the government's motivation was improper, *i.e.*, based on race, religion, or another arbitrary classification. *See United States v. Washington*, 705 F.2d 489, 494 (D.C.Cir. 1983).

Synanon fails both prongs of this test. First, it has not shown that there are others similarly situated who have not been subjected to tax law enforcement. It has failed even to define clearly the class in which it claims membership, referring alternatively to a Christian commune, thousands of rehabilitative organizations, "new religions," organizations with indicted members, and other groups. *See* Plain-

tiff's Memorandum, *supra*, at 20–24. Synanon's claims of improper motivation are equally amorphous, and ring hollow in light of its massive campaign of document and tape destruction and the serious allegations of violence and private inurement.

■ The court also notes that plaintiff's insistence on the crucial significance of this issue seems to rest on a misconception, to put it most charitably. The tax-exempt status of any organization is dependent on its satisfaction of the statutory and extra-statutory requirements. *See* § 501(c)(3) and *Bob Jones, supra.* Political interference or an improper, vindictive campaign against a particular organization, leading to a denial or revocation of tax exemption, is a relevant inquiry: they would render *that decision* null and void. *See, e.g., Center on Corporate Responsibility v. Shultz*, 368 F.Supp. 863, 871 (D.D.C.1973). The appropriate relief in such a case, however, is *not* the automatic grant of tax-exempt status, but rather a proper, unbiased examination of the organization's qualifications. *Id.* at 873–78. That relief is barred in this case by plaintiff's fraud upon the court.

### B. *Synanon's Allegations of Governmental Bad Faith and Misconduct in the Defense of This Lawsuit Do Not Warrant Relief*

■ Synanon has alleged that the government has improperly commingled civil and criminal investigations in the defense of this lawsuit. (Supplemental Memorandum in Support of Plaintiff's Motion to Suppress the Declaration of Bette Fleishman; Plaintiff's Memorandum of Law Regarding Selective Enforcement of the Law.) This has been vigorously denied time and again by counsel for the government's Tax Division, who have refrained from participation in the activities of the Criminal Division of the Department of Justice. (*See, e.g.*, transcript of Aug. 15, 1983 hearing at 31; Memorandum for the United States in Response to Synanon's Supplemental Memorandum to Suppress; Memorandum for the United States in Reply to Synanon's Memorandum Regarding Selective Enforce-

ment of the Law.) The only relevant support for plaintiff's claim is 1) an attorney from the Criminal Division at the Department of Justice accompanied the civil attorneys handling this case on several witness interviews, and 2) the government obtained criminal immunity for several witnesses pursuant to 18 U.S.C. § 6001 *et seq.* before obtaining their sworn statements. Neither of these actions was in any way improper. First, there is no evidence that the presence of the Criminal Division attorney had the purpose or effect of improperly coercing or influencing the witnesses. Further, the government may immunize witnesses in both civil and criminal cases, pursuant to the plain language of § 6003(a), as a number of courts have recognized. *Ryan v. C.I.R.*, 568 F.2d 531, 541–42 (7th Cir.1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); *Patrick v. United States*, 524 F.2d 1109, 1120–21 (7th Cir. 1975); *United States v. Cappetto*, 502 F.2d 1351, 1359 (7th Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *United States v. Mahler*, 567 F.Supp. 82, 83–86 (M.D.Pa.1983). *See also Pillsbury Co. v. Conboy*, — U.S. —, 103 S.Ct. 608, 616 n. 20, 74 L.Ed.2d 430 (1983) (reserving the question of United States Attorneys' authority to immunize in civil proceedings).

▪ The mere concurrence of civil and criminal investigations does not give a civil litigant a basis for either discovery or relief. Here, the United States' participation in civil litigation was precipitated by Synanon's filing of this lawsuit. If the government also has reason to conduct a criminal investigation, its failure to do so would be tantamount to nonfeasance and a violation of the duty of the executive branch to faithfully execute and apply the law. Unquestionably, the government's powers in conducting grand jury investigations are substantial and the surrounding secrecy is necessary. There is nothing improper in this, however, unless government attorneys use one arena of litigation, civil or criminal, to gain advantages to which they are not entitled in the other. *See United States v. Sells Engineering Inc.*, — U.S.

—, 103 S.Ct. 3133, 3142–43, 77 L.Ed.2d 743 (1983); *United States v. Baggot*, — U.S. —, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983). *Cf. United States v. Parrott*, 248 F.Supp. 196, 202 (D.D.C.1965) (improper for the government to *initiate* a parallel civil suit and use discovery to obtain evidence for a subsequent criminal prosecution). Because the government's civil attorneys are entitled to interview witnesses and to obtain grants of criminal immunity for them in the course of defending suits, they have not taken undue advantage of the government's criminal justice powers. If the government's conduct of this case, correct on its face, has been improperly influenced by the existence or the possibility of other litigation, the place to challenge such hypothetical abuses is in those other actions. In this case, plaintiff has no legitimate basis for its claim of governmental misconduct, which the attorneys from the Tax Division have steadfastly and repeatedly denied in open court and in their papers. (*See supra* at ——.)

## IV. THE COURT RELUCTANTLY DECLINES TO APPLY *BOB JONES'* "PUBLIC POLICY" TEST UNDER THE FACTS OF THIS CASE

The government proposed that this case might be resolved under the "public policy" analysis recently articulated by the Supreme Court in *Bob Jones University v. United States*, — U.S. —, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). Specifically, it asserted that Synanon's adoption and implementation of a corporate policy of violence and terror violates fundamental law and public policy, thereby disqualifying it from tax-exempt status, regardless of its alleged satisfaction of the statutory requirements of § 501(c)(3). This Court gave careful consideration to this argument, contemplating first whether a mini-trial on this question would serve the ends of justice and conserve judicial resources, and later, whether judgment in favor of the defendant would be appropriate, given the collateral estoppel effect of the *Bernstein* case. The Court decided, however, that in view of

the result reached herein, it is not necessary to apply the *Bob Jones* analysis to this case on the basis of summary judgment.

One reason for adopting this approach is that the Supreme Court explicitly reserved the question of "whether an organization providing a public benefit and otherwise meeting the requirements of § 501(c)(3) could nevertheless be denied tax-exempt status if certain of its activities violated a law or public policy." *Id.* 103 S.Ct. at 2031 n. 21. There was no need to answer that question in *Bob Jones* because the Supreme Court concluded that "[r]acially discriminatory educational institutions cannot be viewed as conferring a public benefit." *Id.* at 103 S.Ct. at 2031. This Court is concerned with the proper application of the *Bob Jones* analysis if it could be said that Synanon conferred *some* arguable public benefit—drug rehabilitation, for example— while simultaneously maintaining a policy of violence and terror. Given the record in this case, the Court determined that it is not necessary to apply the *Bob Jones* decision even though its dictum clearly indicates that it would have been proper to do so.

## CONCLUSION

For the reasons stated herein, judgment will be entered in favor of the defendant because of the plaintiff's fraud upon the Court, and the case will be dismissed, with prejudice.[9] An order shall issue accordingly of even date herewith. Moreover, all other motions not explicitly ruled upon are unnecessary to decide because of the result herein. Costs shall be awarded to the defendant, and the Court will retain jurisdiction to consider the question of further sanctions against the plaintiff, and some or all of its attorneys who have appeared herein.

---

**9.** *See* Defendant's Second Motion for Summary Judgment, its Motion to Dismiss, and supporting memorandum at 30–53.