**John POWERS, Plaintiff–Appellant,**

v.

**The CHICAGO TRANSIT AUTHORITY, et al., Defendants–Appellees.**

**No. 88–2531.**

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1989.

Decided Dec. 11, 1989.

---

Kenneth N. Flaxman (argued), John L. Gubbins, Gubbins & Associates, Chicago, Ill., for plaintiff-appellant.

Barry S. Alberts (argued), Catherine Masters Epstein, Roger Pascal, Lisa A. Weiland, Alana L. Helverson, Schiff, Hardin & Waite, Chicago, Ill., for defendants-appellees.

Before WOOD, Jr., MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

John Powers filed suit under 42 U.S.C. § 1983 contending that he had been demoted from his position as Associate General Attorney with the Chicago Transit Authority ("CTA") pursuant to a campaign to drive out white attorneys and replace them with black attorneys. Through formal discovery, Powers sought to obtain documents that had been prepared by Joyce Hughes, the CTA's General Attorney, outlining her personnel reorganization plans. Near the close of discovery, yet outside of formal discovery, Powers somehow obtained a copy of a Joyce Hughes memorandum that related to the "Reorganization of the General Attorney Division." Powers considered this memo to be a "smoking gun." The memo stated that "[t]he major difficulty in a staffing realignment ... is Section 28 of the Metropolitan Transit Authority Act [which] protects all CTA employees from discharge or demotion without cause." The memo emphasized the importance of building "a paper record which will substantiate cause for discharge or demotion" of employees.

In December 1987, Powers served the defendants with a request to admit or deny the Hughes memorandum. On receipt of the request, the defendants hand delivered a letter to Powers' attorney, John L. Gubbins, asserting that the memorandum contained privileged attorney-client information. The letter requested Powers and Gubbins to return all copies of the memorandum and to stop all further dissemination of the memo. The letter also demanded an explanation of the circumstances under which Powers and Gubbins obtained the memorandum.

Despite the defendants' plea, Robert O'Conner, another client of Gubbins who was also suing the CTA for reverse discrimination and who had previously obtained a copy of the memorandum from Gubbins, gave a copy of the memo to members of the media. In the following days, the memorandum was widely published in the Chicago print and broadcast media. In addition, Gubbins continued to disseminate the memo, providing a copy to another attorney who was representing a client suing the CTA for reverse discrimination.

On December 24, 1987, the defendants presented the district court with a motion for a protective order and evidentiary hearing. Defendants asserted in their motion that the Hughes memorandum contained confidential information within the ambit of defendants' attorney-client privilege. Defendants' motion sought to bar Powers, Gubbins, and Gubbins' clients from using or further disseminating the memo during the course of Powers' suit. The district court declined to issue a protective order at that time. Instead, it ordered Powers and Gubbins to first answer the defendants' questions concerning the circumstances under which the memorandum came into their hands. The district court believed that, on its face, the memorandum contained privileged attorney-client information. However, the district judge reasoned that the only way he could rule on the merits of the defendants' motion was to first determine whether the CTA had in any manner waived its attorney-client privilege in the course of events through which Powers obtained the memo.

At the December 24th presentation of defendants' motion, Powers chose January 8, 1988, as the date to respond to the defendants' questions. Powers failed however, to file any response on January 8th. The defendants then renewed their motion for a protective order and evidentiary hearing. On January 14, 1988, the district

court heard the motion and again ordered Powers to disclose the circumstances under which he obtained the Hughes memo. The court set January 19th as the new response date. The court also set a hearing for January 22nd should Powers' response prove unsatisfactory.

On January 19th, Powers again failed to respond. Two days later, Gubbins filed a response with an attached letter. The letter was written by Robert O'Connor, the client of Gubbins who had released the Hughes memorandum to the media. Gubbins contended that the letter explained the circumstances under which Powers obtained a copy of the memorandum. In fact, however, the letter did not explicitly state how Powers obtained the memorandum. Rather, the letter merely implied that Powers obtained the memo from O'Connor.[1] At the January 22nd hearing, the district court found that Powers' response was inadequate because it did not name the person who gave Powers the memo. The district court ordered an evidentiary hearing solely on the issue of how the Hughes memorandum got into possession of anybody outside of the CTA as an entity.

At the evidentiary hearing, Powers submitted his own affidavit. The affidavit stated that a CTA employee gave Powers the memo but also announced that Powers refused to name the employee based upon a "confidential-informant-in-litigation" privilege. The affidavit stated that Powers accepted the memo with the understanding that he would keep the employee's identity confidential. The district court rejected Powers' "confidential-informant-in-litigation" privilege, finding that it lacked any basis in law. When the district court then directed Powers to name the person who gave him the Hughes memorandum, Powers still refused to answer. At that point, the district judge recessed the evidentiary hearing for five days. At the resumption of the hearing, Powers again refused to name his source. To accommodate Powers, the court agreed to take his testimony *in*

camera for counsel's eyes and ears only. After the court reconvened in chambers, however, Powers still refused to answer. The court then issued a "direct court order" that Powers answer the next day, March 8, 1988. On March 8th, Powers reasserted his "confidential-informant-in-litigation" privilege and again refused to answer.

Faced with Powers' refusals to provide information as ordered, the district court held Powers in civil contempt. As a sanction to compel compliance, the court imposed a daily fine of $150.00, beginning March 8, 1988, and payable until Powers complied with the order to name his source.

After being held in contempt, Powers appealed to this court. He contended that the district court should have adopted a "confidential-informant-in-litigation" privilege and also contended that the district judge abused his discretion because he ordered disclosure of Powers' source without determining there was a need for the information. *Powers v. Chicago Transit Authority, et al.*, 846 F.2d 1139 (7th Cir.1988) (*Powers I*). On May 24, 1988, this court dismissed Powers' claim for lack of jurisdiction. We held that the district court's civil contempt order was not an appealable "final decision" under 28 U.S.C. § 1291. *Id.* at 1141.

Initially, Powers made only sporadic payments of his fines. Eventually, he stopped paying them altogether. On June 8, 1988, the district court held a hearing to address Powers' refusal to comply with both the order to disclose and the order to pay fines. Noting that the fines appeared to have lost all coercive effect, the district court suggested the option of dismissing Powers' lawsuit unless Powers complied with the disclosure order by a certain date. On July 5, 1988, the district court stopped the further accrual of fines, and ordered that unless Powers complied with the disclosure order and the order to pay fines by July 12, 1988, his suit would be dismissed. Powers

---

**1.** At a later hearing, Gubbins filed an affidavit which revealed that O'Connor obtained the Hughes memorandum from Gubbins himself, who in turn obtained the memorandum from

Powers. Therefore, the actual chain of transfer turned out to be the reverse of what the O'Connor letter implied.

refused to comply in either respect. On July 13, 1988, the district court dismissed Powers' suit. For the reasons discussed below, we affirm the district court's dismissal but reduce the amount of fines that Powers must pay.

### Appropriateness of the Order to Reveal Powers' Source

Powers contends that the district court should not have required him to identify the person that gave him the Hughes memorandum because the identity of his source is not relevant. The district court's disclosure order was made pursuant to its duty during discovery to regulate the exchange of information between the parties. The manner of discovery is committed to the broad discretion of the district court. *United States v. DeFrantz,* 708 F.2d 310, 311 (7th Cir.1983); *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 902 (7th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). Rulings on evidentiary matters, such as relevancy, also fall within the broad discretion of the district court. *See Coates v. Johnson & Johnson,* 756 F.2d 524, 549 (7th Cir.1985); *Douglass v. Hustler Magazine,* 769 F.2d 1128, 1142 (7th Cir.1985). Because we believe that the identity of Powers' source is highly relevant to both the CTA's motion for a protective order and Powers' section 1983 suit, the district court did not abuse its discretion in ordering Powers to reveal his source.

The CTA sought a protective order to bar Powers, Gubbins, and Gubbins' clients from using or further disseminating the Hughes memorandum. In order to decide whether to issue a protective order, the district court first had to determine whether the memorandum contained protected and confidential CTA attorney-client information. To make that determination, the court in turn had to determine whether the CTA had in any manner waived the protection of its attorney-client privilege. The identity of Powers' source is relevant to the issue of waiver. Any voluntary disclosure by the holder of the attorney-client privilege is inconsistent with the attorney-client confidential relationship and thus waives the privilege. *United States v. Buljubasic,* 808 F.2d 1260, 1268 (7th Cir.1987); 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2016 (1971). If Powers obtained the memo from someone who could not maintain the privilege but who the CTA allowed to have access to the memo, or if Powers obtained the memo from someone who had authority to waive the privilege,[2] the memorandum was not entitled to the protection of the attorney-client privilege. If, however, Powers obtained the memo from someone who was not supposed to have access to the memo or who did not have authority to waive the attorney-client privilege, the district court could find that the memo was protected by the privilege. The identity of Powers' source, therefore, was not only relevant information, it was information the district court needed to determine whether it should issue a protective order.[3]

More importantly, we believe that the identity of Powers' source is relevant to the merits of Powers' section 1983 suit against the CTA. Powers' complaint requested an injunction to assure him a senior-level attorney position with the CTA at the conclu-

---

**2.** Before the evidentiary hearing regarding the issue of how Powers obtained the memo, Powers filed a brief asserting that his source had authority to waive the CTA's attorney-client privilege. However, when questioned under oath before the district court, Powers admitted that his source could not be considered a "high-ranking" CTA employee.

**3.** In *Powers I,* this court noted that "[t]he district court ordered Powers to reveal his source without first determining that the information in the memorandum is presumptively privileged and that the method of acquisition spells the differ-

ence between privilege and no privilege." 846 F.2d at 1143. Following our decision in *Powers I,* the district judge clarified his earlier rulings in an oral opinion. The district judge explicitly addressed the apprehensions of this court and explained why he believed the Hughes memorandum was facially privileged and why the identity of Powers' source was relevant to determining whether the CTA waived its attorney-client privilege. The district judge has thoroughly explained the grounds upon which he made his rulings and has put to rest any apprehensions this court may have had in *Powers I.*

sion of his lawsuit. We believe that the circumstances surrounding Powers' acquisition of the Hughes memorandum may raise questions about Powers' ethical conduct and thus are relevant to Powers' right to injunctive relief. *See Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700, 704, 708 (10th Cir.1988) (in an employment discrimination lawsuit, evidence of employee misconduct, discovered after the acts of alleged discrimination, is relevant in determining what relief or remedy is available to the employee). When Powers filed his suit, he found himself in the position of having the CTA as both a client and an adversary. As a CTA attorney, he continued to owe the CTA an ethical duty. Under Disciplinary Rule 4–101 of the Illinois Code of Professional Responsibility, Powers had a duty not to reveal his client's confidences or secrets, use them to his client's disadvantage, or use them to his own advantage without his client's consent. Rule 4–101(a) defines "confidence" as information protected by the attorney-client privilege. In addition to client "confidences," Rule 4–101 also protects client "secrets." The rule defines "secrets" as information gained in the attorney-client relationship that the client requests be held secret or that the disclosure of would be embarrassing or detrimental to the client. If the Hughes memorandum is a client "confidence" or "secret," Powers has apparently breached an ethical duty that he owed to the CTA. Powers not only revealed the memo to persons outside of the CTA attorney-client relationship, he also attempted to use the memo to his client's disadvantage and to his own advantage without any apparent client consent.

The identity of Powers' source is relevant to determining whether the Hughes memorandum was a client "confidence" or "secret" within the meaning of Rule 4–101. As we previously discussed, the identity of Powers' source is information the district court needed to determine whether the

CTA waived its attorney-client privilege, and, therefore, it is relevant to determining whether the memo is a client "confidence." The identity of Powers' source is also relevant in determining whether the memo is a client "secret." If Powers obtained the memo from someone outside of the attorney-client relationship who the CTA allowed to have access to the memo, the memo could not be considered a "secret." Likewise, the memo could not be considered a "secret" if Powers obtained it from a CTA official with authority to consent to Powers use and dissemination of the memo outside of the CTA's attorney-client relationship.

If the source's name alone would not resolve the issue of whether the memorandum is a client "confidence" or "secret," the name would still be discoverable under Federal Rule of Civil Procedure 26(b)(1) as information "reasonably calculated to lead to the discovery of admissible evidence." For instance, the source could provide important information about his or her intent, and perhaps the CTA's intent, regarding Powers' use of the memo and the intended confidential status of the memo.

■ Powers contends that even if the identity of his source is relevant, he still should not have to comply with the disclosure order because the identity of his source is privileged information. Powers proposes that we adopt a "confidential-informant-in-litigation" privilege to apply whenever a litigant, (1) on a promise of confidentiality, (2) is given a non-privileged document, (3) that should have been produced in discovery. Powers cites no authority for this novel "confidential-informant-in-litigation" privilege. Because we believe Powers' proposed privilege is overbroad and because we are unable to find any authority supporting such a theory, we hold that Powers' self-styled privilege does not protect him from revealing the identity of his source.[4]

---

**4.** We decline to further discuss the merits of Powers' proposed privilege. As this court stated in *Powers I,* "[a] litigant may not, by refusing a simple request (here, for *in camera* review), propel a court into a decision on a much more complex matter (here, request to create a novel privilege)." 846 F.2d at 1143. The district court's offer to take Powers' testimony *in camera* was the correct procedure for accommodating the conflicting interests of disclosure and

In addition, even if we had adopted Powers' proposed privilege, the facts of this case would not meet the requirements of Powers' own three-part privilege test. The first part of Powers' proposed privilege requires that a litigant obtain a document on a promise of confidentiality. Powers has admitted, however, that his source gave him the memorandum without first requesting that his or her identity be protected. It was Powers who, after obtaining the memo and on his own initiative, volunteered to keep the source's identity a secret.

The second part of Powers' proposed privilege requires that a litigant receive a non-privileged document from his source. The district court did not, however, determine that the Hughes memorandum was not privileged. On the contrary, the district court concluded that on its face, the memo fell within the protection of the CTA's attorney-client privilege. In her memorandum, Hughes discussed the legal test requiring "cause" for discharge or demotion, the prior practice that bears on the legal test and its application, the reasons for following one course of possible action rather than another, and a recommendation based on that analysis. Powers argues that the document is not a legal memorandum but is merely an administrative memorandum containing advice from one bureaucrat to another on how to reorganize a division of the CTA. Like the district court, we do not believe a document can be categorized as either an administrative or a legal memorandum as though those two things must somehow be mutually exclusive. Given the content of the Hughes memorandum, it fell within the ambit of the CTA's attorney-client privilege.

The third part of Powers' proposed privilege requires that the document should have been produced in discovery. Whether the Hughes memorandum should have been produced in discovery, however, was an issue for the district court to decide. While attorney-client privileged documents are not always immune from discovery, the

district court gave no indication that it would admit the Hughes memorandum if it found that the CTA had not waived its attorney-client privilege. The CTA denies that it ever waived its attorney-client privilege with respect to the Hughes memorandum. Unless Powers could show that the CTA did waive its privilege, the memo, being privileged on its face, was not subject to production in discovery.

### Dismissal of Powers' Lawsuit

Powers contends that the district court abused its discretion in dismissing his lawsuit against the CTA. Powers argues that the appropriate sanction for his refusal to reveal the identity of his source was to bar Powers from referring to the Hughes memorandum during the course of his lawsuit. Federal Rule of Civil Procedure 37(b)(2) authorizes a district court to impose sanctions, including dismissal, on a party who "fails to obey an order to provide or permit discovery." An order of dismissal pursuant to Rule 37(b) is reviewable only for an abuse of discretion. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *Sere v. Board of Trustees*, 852 F.2d 285, 289 (7th Cir.1988); *Patterson v. Coca–Cola Bottling Co.*, 852 F.2d 280, 283 (7th Cir.1988). In addition, a district court's determination of the appropriate remedy for civil contempt is reviewable only for an abuse of discretion. *United States v. Huebner*, 752 F.2d 1235, 1244 (7th Cir.), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985).

The district court did not abuse its discretion in dismissing Powers' lawsuit. Throughout the proceedings, the district judge demonstrated extensive patience in exercising his discretion. At two separate hearings, the district court ordered Powers and Gubbins to identify the source of the Hughes memorandum. Both times, Powers and Gubbins refused to respond. At a hearing several months later, the district court rejected Powers' "confidential-infor-

---

privilege even where well-established privileges are applicable. *See United States v. Fakhoury,* 819 F.2d 1415, 1424 (7th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

mant-in-litigation" privilege as frivolous. Nevertheless, Powers again refused to obey the court's order to identify his source. At that point the district court gave Powers five days to think over his decision not to comply. Five days later, Powers again refused to answer. Despite the fact that the district court found that the name of Powers' source was not privileged information, to accommodate Powers, the district court agreed to take Powers' testimony *in camera* for counsel's eyes and ears only. When the parties met in chambers, however, Powers still refused to reveal his source.

Under Rule 37(b), dismissal is proper when a plaintiff's failure to comply with a discovery order is wilful. *National Hockey League*, 427 U.S. at 640, 96 S.Ct. at 2779; *Sere*, 852 F.2d at 289; *Patterson*, 852 F.2d at 283. However, even after Powers refused to answer *in camera*, the district court did not dismiss his suit. Instead, the court held Powers in civil contempt and imposed a daily fine of $150.00 to attempt to get Powers to comply with its disclosure order. Over the next two and one half months, Powers failed to comply with the disclosure order. He also made erratic and incomplete payments of his fines and eventually stopped making payments altogether. At Powers' next hearing, the district court still did not dismiss his suit. Rather, the court warned Powers that he had one more week to comply before the court would dismiss his suit. One week later, after Powers still refused to comply, the court dismissed his case.

■ Dismissal is appropriate when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing. *Schilling v. Walworth County Park & Plan Comm'n*, 805 F.2d 272, 275 (7th Cir.1986). The district court gave Powers numerous opportunities to comply with its disclosure order before it dismissed his lawsuit. In addition, the court (although not required to so

refrain) did not resort to dismissal as its first sanction. Rather, the court dismissed Powers' suit only after Powers defied the less severe sanction of a fine designed to secure compliance. Throughout the proceedings, it became apparent that more opportunities to comply and continued fines would not induce Powers to reveal the identity of his source. Because of this, the district court was well within its discretion to dismiss Powers' suit.

■ Finally, the district court did not abuse its discretion by dismissing Powers' suit instead of barring Powers from using the Hughes memorandum. The district judge clearly articulated his reasons for not employing exclusion as a sanction.[5] The court determined that exclusion of the memo would not give Powers strong enough of an incentive to reveal the identity of his source, which was information crucial to the defendants' ability to prepare for Powers' section 1983 suit against them. As we discussed earlier, we agree with the district court that the identity of Powers' source could lead to the discovery of important evidence that sheds light on Powers' fitness to hold the senior-level attorney position he sought to secure in his section 1983 suit. Since exclusion of the memo was not as likely to coerce Powers to reveal his source as dismissal was, we cannot say that the district court abused its discretion in choosing dismissal rather than exclusion as the proper contempt sanction.

### Amount of Fines

■ A district court can assess a civil fine against a party for contemptuous conduct in an amount sufficient to coerce that party to comply with the court's order. *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 748 (7th Cir. 1976); *See also Shakman, et al. v. Democratic Organization of Cook County*, 533 F.2d 344 (7th Cir.), *cert. denied*, 429 U.S. 858, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976).

**5.** In *Powers I,* this court was concerned about the fact that the district court "did not explain why it turned to fines rather than other tools at its disposal." 846 F.2d at 1143. In his oral opinion following our decision in *Powers I,* the district judge adequately addressed our concern with a thorough explanation of why he imposed fines and then dismissed Powers' suit rather than bar the Hughes memorandum from evidence.

When the purpose of a contempt sanction is to coerce compliance with a court order the court must consider: (1) the character and magnitude of the harm threatened by continued contumacy; (2) the probable effectiveness of the sanction in bringing about the result desired; and (3) the contemptor's financial resources and the consequent seriousness of the burden of the sanction upon him. *United States v. United Mine Workers of America*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). In light of these three factors, the district court did not abuse its discretion in originally imposing a fine of $150.00 a day. First, the CTA was harmed by Powers' continued refusal to identify his source. Without knowing the identity of Powers' source, the district court was unable to rule on the CTA's motion for a protective order. In addition, Powers' refusal to identify his source impaired the CTA's ability to formulate a defense to Powers' section 1983 suit. Second, in setting the amount of the fine, the court was very careful to make sure that the fine was no larger than necessary to coerce Powers to comply. We see no reason why the district judge should have believed that the $150.00 a day fine would not persuade Powers to comply. Third, the record shows that the district judge carefully considered Powers' financial circumstances before arriving at the $150.00 a day figure. From our review of the record, we can find no evidence that Powers was financially unable to pay the $150.00 daily fine.

■ On July 5, 1988, the district court stopped the further accrual of fines. The court was concerned that the accruing fines had lost all coercive effect and were, over time, beginning to appear punitive. By the time the district court had stopped accrual of the fines, they amounted to $17,850.00. While we do not believe that the original $150.00 daily fine was an abuse of discretion, we share the district court's concern that, over time, the accruing fines had become punitive. In light of the fact that dismissal of Powers' lawsuit was an appropriate sanction, in hindsight, we believe that an additional contempt sanction of $17,850.00 is excessive. We therefore re-

duce the amount of fines that Powers must pay to $2,000.00.

The district court's finding of contempt, imposition of fines, and subsequent dismissal of the case is AFFIRMED. The amount of the accumulated fines is reduced in accordance with this opinion.