Thomas G. **BRADY**, d/b/a Brady Aluminum & Construction Co., Plaintiff,

v.

**UNITED STATES** of America, Defendant.

No. 92–1466.

United States District Court, C.D. Illinois, Peoria Division.

Dec. 21, 1994.

Dean B. Rhoades, Robert H. Rhode, Edward F. Sutkowski, Kenneth Ray Eathington of Sutkowski & Washkuhn, Ltd., Peoria, IL, for plaintiff.

Scott H. Harris, Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## ORDER

MIHM, Chief Judge.

This matter is before the Court for decision following evidentiary hearings on the United States' Motion to Dismiss and for Default. For the reasons set forth below, the United States' Motion is GRANTED. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court's findings of fact and conclusions of law are set forth below. These findings are intended to supplement the oral findings made by the Court on September 9, 1994.

### BACKGROUND

Thomas Brady filed this lawsuit on October 20, 1992, seeking a refund of tax paid to the United States. Mr. Brady maintains that the Internal Revenue Service (IRS) improperly assessed and collected employment taxes from him. Specifically, Mr. Brady argues that his construction business used independent contractors and not employees, and, therefore, he was not an employer within the meaning of the Internal Revenue Code.

On or about March 22, 1993, the United States amended its answer to add a counterclaim seeking to reduce to judgment its tax assessment against Mr. Brady. The United States' counterclaim includes all of the employment taxes and penalties allegedly owed

by Mr. Brady for the years 1983 through 1988, inclusive.

On December 16, 1993, the United States filed its Motion to Dismiss and for Default, arguing that Mr. Brady had destroyed and manufactured evidence and that he had testified in a misleading and inaccurate fashion in response to the Government's interrogatories and requests for production. The Government also claimed that Mr. Brady's deposition testimony was false and misleading.

## FINDINGS OF FACT

1. Mr. Brady began his business as a sole proprietor doing general home repair contracting during the 1970s. (Vol. II, p. 130).

2. Between 1983 and 1988, the years at issue, Mr. Brady was so employed. His projects included a variety of commercial and residential construction, including aluminum residing, window replacement, pool installation, building garages and porches and roof replacement.

3. From 1983 through 1985, Mr. Brady conducted his business from his home located at 145 Stonegate Drive in Canton, Illinois. (Vol. II, p. 137) After acquiring a lumberyard known as Linn Street Lumber in January, 1986, Mr. Brady headquartered his business therein. *Id.* .

4. The Court rejects Mr. Brady's testimony that he never paid his workers an hourly wage. The evidence demonstrates that Mr. Brady not only paid his workers an hourly wage, but that he once had records reflecting that practice.

5. Gerald Nelson, who was employed by Mr. Brady from the end of 1983 through November of 1986 (Vol. I, p. 60), testified that he started working for Mr. Brady at a rate of $5.00 per hour and was thereafter given raises. By the time he left Mr. Brady's employ, he was making $9.25 per hour. (Vol. I, pp. 61–62) The only time Mr. Brady paid Mr. Nelson in some manner other than an hourly rate was for a brief period in late 1983 or in early 1984 when Mr. Brady paid him based on the number of feet of siding Mr. Nelson had installed. (Vol. 1, pp. 72–76, 84, 97–98)

6. At the start of his employment with Brady Construction, Mr. Nelson reported to Mr. Brady the numbers of hours he had worked and the projects associated with those hours on random pieces of paper. (Vol. I, pp. 61–62) Mr. Nelson turned those pieces of paper over to Mr. Brady and, in turn, received a paycheck. (Vol. I, p. 62) Toward the end of 1985 or early 1986, Mr. Brady had Mr. Nelson complete prepared "time sheets". *Id.* The "time sheets" required Mr. Nelson to record the name of the job he was working on, the number of hours expended on the job, and the days of the week associated with those hours. *Id.* The time slips and sheets generally were turned in to Mr. Brady or his secretaries on Thursday, and Mr. Nelson received his paycheck on Friday. (Vol. I, p. 63)

7. Rick Sheets began working for Mr. Brady as a carpenter/laborer in 1979. (Vol. I, p. 187) He terminated his employment with Mr. Brady around the end of 1987. *Id.* During his employment with Mr. Brady, Mr. Sheets earned between $4.50 and $8.00 per hour. (Vol. I, p. 189) Mr. Sheets also testified to submitting "time sheets" to Mr. Brady prior to his receipt of his weekly paycheck. The time sheets reflected the hours and days of the week which Mr. Sheets worked and specified the jobs upon which he expended his time. (Vol. I, p. 191) For the majority of his employment with Mr. Brady, Mr. Sheets completed and turned in his time sheets on Friday and received his paycheck on Friday. (Vol. I, p. 191) At some point, however, this practice changed, and Mr. Brady decided to stagger his workers' pay day because "it looked too obvious that [his workers] were being paid always on Friday and being claimed as subcontractors." (Vol. I, p. 192)

8. Both Daniel York and Mark Steven Smith similarly testified that Mr. Brady paid them an hourly wage during their employment with Mr. Brady. (Vol. I, pp. 143, 145, 149; Vol. II, pp. 276, 280–281, 287, 290) They too testified about the written reports they submitted to Mr. Brady on a weekly basis which itemized the number of hours they worked during the preceding week. (Vol. I, pp. 146, 148; Vol. II, pp. 287–288) The Court

notes in evaluating the credibility of their testimony that Mr. York still considers himself to be Mr. Brady's friend (Vol. I, p. 160) and, as Mr. Brady pointed out, Mr. Smith is not a part of the prevailing wage actions against Mr. Brady. (Vol. II, p. 286)

9. Mr. Brady's former staff members corroborated the workers' testimony that they were paid on an hourly basis and submitted supporting written reports. Carolyn Apt recalled specifically the manner in which Mr. Brady's workers' wages were calculated. She testified that: .

"When Mr. Brady's guys would come in at the end of the week and turn in their time sheets, occasionally [Mr. Brady] would hand [the time sheets] to me or Christine Banks, who was working for him at the time. We would figure up the hourly wage and how many hours the guys worked on these sheets, and then I would draw up the paychecks for those."

(Vol. I, p. 21) Ms. Apt's description of the content of the time sheets was similar to the description given by the above-referenced workers. (Vol. I, p. 22)

10. Linda Hefflin, another of Mr. Brady's office staff, also testified that Mr. Brady paid his workers an hourly wage and that the workers recorded their time on written time slips submitted weekly to Mr. Brady. (Vol. II, pp. 46–48) Ms. Hefflin described the time slips submitted by Mr. Brady's workers to Mr. Brady as reflecting the number of hours each worker spent on Mr. Brady's various projects, associated with the days of the week during which that work was performed. (Vol. II, pp. 46, 84)

11. The time records for Brady Construction for the years prior to 1986 were retained by Mr. Brady in one or more shoe boxes stored in a filing cabinet in his office. (Vol. I, pp. 23–24, 27, 40, 41; Vol. II, pp. 47–50) During several months during the middle part of 1986, Lynn and Tom Brady instructed Ms. Apt to transfer the information from the time slips in the shoe boxes to a spreadsheet. (Vol. I, pp. 23–24) Ms. Apt created a chart reflecting the information included on the time slips: workers' names, the job name, the hours and associated days of the week, hourly wage and total pay for a job.

(Vol. II, p. 51; Gov't Exhibit 24) The time slips were thereafter destroyed. (Vol. II, pp. 51–52)

12. Mr. Brady failed to disclose the existence of the time slips or to explain their destruction in response to specific attempts by the Government to determine that information.

13. At the hearing on this matter, Mr. Brady denied paying his workers by the hour. (Vol. II, p. 242) He also testified that any records he might have reflecting hours worked were submitted merely for the convenience of those working for him. (Vol. II, p. 222) Mr. Brady further denied any knowledge of the time slips that each of his employees testified they submitted and that Ms. Hefflin and Ms. Apt recalled having seen stored in shoe boxes in Mr. Brady's office. (Vol. II, pp. 227, 248) Incredibly, he also disavowed any knowledge about the few time slips that remain in his files, time slips that he offered into evidence. (Vol. II, pp. 219–221)

14. Mr. Brady willfully destroyed both the time slips and the sheets that summarized those time slips. Mr. Sheets testified about the destruction of some time records during his direct examination:

Q. What did Mr. Brady tell you regarding the destruction of documents?

A. He told me that he had been asked to produce the time sheets for the man and that he couldn't produce those records because they got burned. . . .

Q. Was that the investigator you mentioned?

A. I don't, at this time, remember if it was Mr. Barker for the Department of Labor or the IRS investigator. . . .

Q. Do you know whether those records were destroyed in the ordinary course of business?

A. No, I really don't think so. He told me that he couldn't produce them because they had been burned, and he had a very big smile on his face when he said it.

Q. Do you know what documents were burned or destroyed?

A. The only ones that I'm sure of were the time sheets that he told me of.

Q. He told you that there were time sheets?

A. Yes.

(Vol. I, pp. 199–201)

15. Mr. Brady attempted to destroy all objective evidence of having paid his workers on an hourly basis when he destroyed the original hourly time records and then instructed his office staff to remove all hourly references from the records that Ms. Apt constructed from the time slips. Ms. Hefflin recalled precisely the circumstances surrounding the alteration of the records prepared by Carolyn Apt. (Vol. II, pp. 60–62) With reference to those records, Ms. Hefflin testified that:

> ... Tom had these general ledger sheets laid out on a desk in his office, in the main office that used to be the lumberyard's office, along with canceled checks; and he was going through these weekly sheets. And he was—he had crossed out the hours and the amount of pay per week. He was matching the canceled checks with the worker's name; and then in some cases, he was changing the job name that these men worked on.
>
> I went up there to ask him a question about a job and how to, he wanted it billed or what material he wanted; and he volunteered that he was too busy and that he needed to get this done, that the men from the IRS had asked for these records and that he would not give them to him; he wasn't that stupid—that he was smarter, is the way he put it, than to give these records to the IRS.

(Vol. II, pp. 60–62)

16. Ms. Hefflin's recollection of the destruction and motive for destroying the records reflecting hourly wages was further confirmed by the testimony of Connie Glad and Joan Roberts. Around September, 1988, Ms. Glad was asked to "change or alter" certain sheets which she described as resembling those prepared by Carolyn Apt. (Vol. I, pp. 166, 169, 179) Because she knew Mr. Brady was being investigated for something to do with "time sheets" and because she felt there was no need to make the requested alterations, Ms. Glad felt uncomfortable with her assigned task. (Vol. I, pp. 169–170, 172–174, 175) She quit her job rather than alter those documents. (Vol. I, pp. 176, 182)

17. Ms. Roberts was asked to complete the job that Ms. Glad refused to do. (Vol. II, p. 96) Ms. Roberts was asked to transpose information from the ledgers containing the time sheet information to a second sheet of papers and omit any reference to hours worked or hourly wages. (Vol. II, pp. 97–98, 118) She too felt there was something improper about the transposition Mr. Brady ordered in light of the ongoing state and federal investigations into Mr. Brady's business affairs. (Vol. II, pp. 98–100) Ms. Roberts even called her brother to assure herself that she would not be implicated in Mr. Brady's apparent wrongdoing. (Vol. II, p. 98)

18. Although the Government believed that Mr. Brady paid his workers on an hourly basis and had records memorializing that fact, nothing in Mr. Brady's responses to interrogatories or in his answers to deposition questions supported those facts.

19. Mr. Brady had several chances to disclose the fact that his workers were, for the most part, paid an hourly wage. He was asked in interrogatories to "State in exact detail, for the periods in question, the manner in which you compensated the individuals working for your 'Brady Aluminum and Construction Co.' business." (Gov't Exhibit No. 2, Interrogatory No. 5) He answered, "Contracted with independent contractors who were paid based on a piece work, specified bid, and as billed". (Gov't Exhibit No. 5, Interrogatory No. 5) Similarly, Mr. Brady was asked in interrogatories whether any of his workers submitted any written reports to him, including reports of hours worked. (Gov't Exhibit No. 2, Interrogatory No. 6) He responded by saying that the only documents submitted by his workers were statements for services rendered. (Gov't Exhibit No. 5, Interrogatory No. 6) His deposition testimony is equally lacking in candor on the hourly wage issue. (Brady Dep. 8/12/94, pp. 151, 155–156; Brady Dep. 1/28/94, pp. 69–70)

20. Mr. Brady gave no indication in response to the Government's request for documents that he had destroyed certain ledgers and time slips. In its requests, the Government specified that, "[i]f documents cannot be located, describe with particularity the efforts made to locate the documents and the specific reason for their disappearance or unavailability." (Gov't Exhibit No. 1, Instruction B) Mr. Brady failed to indicate that the time slips submitted by his workers were no longer available to the Government. Instead, Mr. Brady's response was that the Government should "[s]ee documents produced". (Gov't Exhibit No. 4, Request 8)

21. Mr. Brady also attempted to create a factual record supporting his case by backdating a number of what he termed "General Contract Proposal" forms (Proposals).[1] (Gov't Exhibit No. 18) These forms stated that the signer agreed to work for Mr. Brady "[a]s a sub-contractor furnishing a certificate of liability insurance, responsible for all state and federal taxes, carrying Workman's Compensation if applies," and further provided that, "Not an employee of Brady's Aluminum and Construction." The proposal forms at issue in this hearing were all dated January 1, 1984.

22. Mr. Brady was aware at the time the Government took his deposition on January 28, 1994, that he had been accused of altering and backdating documents. (Vol. II, p. 249) When asked at his deposition about the proposals and the date on which they were signed, Mr. Brady conceded that they had been backdated by several months. (Brady Dep. 1/28/94, p. 4) At his deposition, Mr. Brady testified that he was certain that although the proposals had been backdated, it was not by more than a couple of months. He testified at his deposition that he was certain as to the timing of the preparation and execution of the subject proposals because he recalled clearly the events related thereto.[2] He was absolutely certain that he

---

1. These General Contract Proposal forms were the subject of earlier forensic testing by the Government. The report of the forensic tests has been sealed by the Court and remains a part of the record in this case.

2. His deposition testimony was as follows:
   Q. Is it possible that [the proposal forms] were signed a year or two after 1984?
   A. That [the proposals] were signed after '84?
   Q. Yes.
   A. No.
   Q. Is it possible they were signed in 1986?
   A. No, sir.
   Q. How do you know that with certainty?
   A. Because my wife is the one who typed these up. She typed it up at the typewriter from our house, and I remember specifically when—these circumstances of how these got signed and why.
   Q. Why don't you tell me about the circumstances under which these documents were signed?
   A. The circumstances involved that the auditor from Pekin Insurance, an auditor every year of who the insurance carrier is who I carry for my own personal liability insurance—
   Q. Just a second. I don't mean to interrupt, but you say—I want to know specifically the circumstances surrounding the preparation of these documents.... Your answer was just that on a yearly basis an insurance auditor generally—I want it to be clear that I'm asking specifically about [the proposal forms] and the circumstances surrounding their preparation.
   A. Right. The auditor for the insurance company that has my liability insurance called our house. Linn (sic) answered the telephone. He told her who he was. He asked her some specific questions about the amount of gross sales. He asked her about certificates of insurance liability on the subcontractors, and she didn't quite understand what he was talking about, and he tried to go over some specifics with her, and she decided she didn't know enough about it, that he would have to talk to me, and about two weeks later I got a bill from Pekin Insurance with three, four thousand dollars' worth of workman's comp to have to pay these individuals. And so I called the auditor back and told him I had the certificates of insurance on these people, and then they dropped the workman's comp on the audit, and I paid the balance due on the general liability policy.
   Q. And tell me how that initiated these proposals.
   A. Okay. So, what happened then is in talking to that particular individual when I called back and talked to him about having the certificates of insurance, we talked about—he said you'd have to have a certificate of insurance on these people. He asked me if I had contracts with them, and I said yes. He said, he suggested I have a contract with them also signed by both of us that he could see if he came for an audit that would substantiate that they knew that they were not employees of mine, and that's what instituted me making these up.
   (Brady Dep. 1/28/94, pp. 4–7).

prepared the subject proposal form at the time he was audited by the insurance company which had written his workman's compensation policy. (Brady Dep. 1/28/94, pp. 4–9)

23. At the June 1, 1994 evidentiary hearing, the Government offered the testimony and business records of Milton Hasty into evidence. (Vol. I, pp. 109–140) That testimony and those records demonstrate that the first workman's compensation audit with respect to Mr. Brady's business occurred in mid–1985. (Vol. I, pp. 111–113, 115–116, 117–118, 125 and Gov't Exhibit No. 21) Milton Hasty's testimony materially contradicted Mr. Brady's 1/28/94 deposition testimony.

24. Mr. Brady then changed his explanation about the execution of the proposals at the hearing on the Government's motion. At the hearing, Mr. Brady testified that he had a very clear recollection that the proposals were prepared at the instigation of an attorney on whose home Mr. Brady was working. (Vol. II, pp. 175–176) Mr. Brady's changing testimony, and his shifting answers to questions such as why the dates at the top of the proposals were "whited-out" and typewritten over while the dates at the bottom of the proposal were in pencil, undermines his credibility completely. (Vol. II, pp. 256–257)

25. Mrs. Brady's testimony concerning these proposals is also rejected as incredible. Her testimony furthermore suggests the possibility that she and her husband violated the Court's Sequestration Order. Like Mr. Brady, Mrs. Brady specifically recalled at her deposition taken on 1/28/94 that the proposals were created sometime in 1984. She testified at her deposition that she recalled having prepared the proposals because of an insurance audit. (Vol. II, p. 302) In contrast, her testimony at the hearing was that she had no recollection as to why she prepared the contract proposals but that she knew they were prepared before November of 1984 because after that date she was working a 40–hour week and would never have had the hour or so it could have taken to type the several proposals, and she also recognized the print on the proposal as having been generated by her typewriter that was broken in November of 1984. (Vol. II, pp. 293–294, 301)

26. The fact that the proposals were backdated by approximately two years is also supported by the testimony of Mr. Brady's workers and secretaries. Mr. Nelson, Mr. Sheets, Ms. Hefflin and Ms. Apt all testified that the proposals were not created until sometime after the first third of 1986. (Vol. I, pp. 28–31, 66, 77, 203–205; Vol. II, pp. 55–59)

27. The fact that Mr. Brady was aware of the State and/or Federal Government investigations and perceived the possible financial consequences can be inferred from Mr. Brady's conveyance of his lumberyard to his wife for no consideration in the early part of 1986. Mr. Brady purchased the lumberyard in March or April of 1986 and transferred it to his wife soon thereafter. (Vol. II, p. 228) She paid, at most, a dollar for the transfer. (Vol. II, p. 229) When asked by the Court about the gratuitous conveyance of the lumberyard to her by her husband, Mrs. Brady stated that it was because she was running the company and "did it for five years without a paycheck" so it was "only fair". (Vol. II, p. 313) However, the conveyance of the lumberyard was only months after its purchase and was not supported by five years of "sweat-equity". (Vol. II, p. 314)

28. Moreover, Mr. Brady attempted to conceal all of the above-referenced actions by failing to disclose the identities of the four women who provided most of the evidence against him at the evidentiary hearing.

29. On December 6, 1992, the United States served Mr. Brady with its first set of interrogatories. The Government asked three interrogatories designed to elicit the identities of individuals having knowledge of facts relevant to this lawsuit. Those three interrogatories are as follows:

Interrogatory No. 8: State the name, address and telephone number of each and every person who has knowledge of any facts that support your contentions found in your Complaint or the attachments thereto, and for each such person:

a. Describe how and when each such person came to have knowledge of the facts relevant to the case.

b. State the facts to which each such person has knowledge.

Interrogatory No. 9: State the name, address and telephone number of each and every person who has knowledge of any facts contrary to the contentions found in your Complaint and the attachments thereto. For each such named individual, please:

a. Describe how and when each such person came to have knowledge of the facts relevant to the case.

b. State the facts to which each such person has knowledge.

Interrogatory No. 10: State the name, address and telephone number of any bookkeepers and/or accountants who kept any books and records for Brady Aluminum and Construction Co. during the periods at issue.

(Gov't Exhibit No. 2) When Mr. Brady responded to the Government's interrogatories on March 12, 1993, he made no mention of Ms. Hefflin, Ms. Apt, Ms. Glad and Ms. Roberts. (Gov't Exhibit No. 5) Mr. Brady then supplemented his responses on July 29, 1993, wherein he modified his answer to Interrogatory No. 8 to identify Joan Roberts. (Gov't Exhibit No. 9) The identities of Ms. Hefflin, Ms. Apt and Ms. Glad were still unknown to the Government eight months after they should have been disclosed. Mr. Brady again supplemented his responses to Interrogatory No. 8 on or about August 18, 1993, this time providing the names of two additional secretaries, Pam Myers and Lisa Harris. Mr. Brady again failed to identify Ms. Hefflin, Ms. Apt and Ms. Glad, individuals whose identity was clearly called for by terms of the Government's interrogatories.

30. Ms. Hefflin testified that she was contacted by Mr. Brady's representative, Janet Surratt, on or about the 11th or 12th of August, 1993. (Vol. II, p. 64) In a telephone conversation on or about those same dates, Ms. Hefflin told Ms. Surratt that she had been employed by Mr. Brady and that one of her functions had been to assign Mr. Brady's workers to their respective jobs on a daily basis. (Vol. II, pp. 65–66)

31. Mr. Brady acknowledged at the hearing on this matter that he knew Ms. Hefflin had a view of the facts pertaining to this case. (Vol. II, pp. 232–234, 250) Mr. Brady offered no explanation for his failure to include Ms. Hefflin in his responses to the Government's interrogatories. (Vol. II, p. 250)

32. The Court rejects Mr. Brady's rationale for not including Ms. Apt and Ms. Glad in his responses to interrogatories. He explained that he did not disclose Ms. Apt and Ms. Glad because they were not paid by his operation but were paid by Linn Street Lumber. (Vol. II, pp. 234–235) This explanation is unbelievable, however, because Mr. Brady supplemented his interrogatory responses to disclose Joan Roberts, Pam Myers and Lisa Harris, and they too were paid by Linn Street Lumber and not by Brady Construction. (Vol. II, pp. 234–235) Mr. Brady had his secretaries paid by Linn Street Lumber largely so as to avoid any appearance that he had employees working for him. (Vol. II, p. 118)[3]

33. Finally, the Court finds that Mr. Brady and his wife committed perjury when they testified before the Court that the "General Contract Proposal" forms were created in 1984. The Court believes these documents were created in 1986 in response to the prevailing wage investigation going on at that time. Mr. Brady further perjured himself when he denied ever paying his workers on an hourly basis and denied once having records evidencing this fact.

---

**3.** The examination of Ms. Roberts on this point was as follows:

Q. Do you recall Mr. Katz [the IRS agent] visiting Mr. Brady's premises?
A. Several times.
Q. What did you do when Mr. Katz visited?
A. I would go downstairs.
Q. Why?

A. 'Cause at first I really wasn't supposed to be Tom's secretary. I was supposed to be down at the lumberyard so PIC would pay for part of my wages.
Q. And so why did—why did you have to go downstairs when Mr. Katz came in?
A. Because he had no employees.

(Vol. II, pp. 118–119)

## CONCLUSIONS OF LAW

■ 1. Courts have the inherent power to fashion and impose appropriate sanctions for conduct which abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46, 111 S.Ct. 2123, 2132–2133, 115 L.Ed.2d 27 (1991).

2. "This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers." *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 461 (4th Cir.1993) (*citing Chambers*, 501 U.S. at 43, 111 S.Ct. at 2132).

■ 3. The Court recognizes that because of their potency, inherent powers must be exercised with restraint and discretion, and discretion in sanctioning litigants is not unfettered. *Chambers*, 501 U.S. at 43, 111 S.Ct. at 2132; *Marrocco v. General Motors Corp.*, 966 F.2d 220, 223 (7th Cir.1992).

■ 4. Dismissal may be ordered as a sanction upon a finding of bad faith, willfulness, or fault. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 640, 96 S.Ct. 2778, 2779, 49 L.Ed.2d 747 (1976); *Societe Internationale v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958). "Bad faith" is conduct which is either intentional or in reckless disregard of a party's obligations. *Marrocco*, 966 F.2d at 224.

■ 5. "A dismissal with prejudice is a harsh sanction which should usually be employed only in extreme situations, where there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailable." *Id.* (quoting *Webber v. Eye Corp.*, 721 F.2d 1067, 1069 (7th Cir.1983); *Powers v. Chicago Transit Authority*, 890 F.2d 1355, 1362 (7th Cir. 1989)).

■ 6. The law favors trials on the merits. *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1206 (7th Cir.1984). However, a party's right to a trial on the merits is not absolute. Attorneys and parties who want to use the judicial system to settle their disputes have certain obligations and responsibilities.

■ 7. For example, a party has the obligation to preserve and not alter documents it knows or reasonably should know are relevant to imminent litigation where the destruction or alteration of those documents would prejudice its opponent. *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267–268 (8th Cir.1993); *Shepherd v. American Broadcasting Companies, Inc.*, 151 F.R.D. 194, 198 (D.D.C.1993). Mr. Brady backdated the General Contract Proposals from sometime after the first third of 1986 to January 1, 1984. Mr. Brady destroyed workers' time slips indicating hours worked which he stored in shoe boxes. Mr. Brady further instructed members of his staff to remove all hourly references from records summarizing workers' time slips. Mr. Brady knew the importance of hourly pay records because at the time he destroyed the time slips and altered documents, the Illinois Department of Labor's prevailing wage investigation had begun. The Government was clearly prejudiced by the destruction of evidence which would have helped its case. The Government was further prejudiced by having to expend valuable time and money on presenting its evidence of destruction and alteration of documents at the evidentiary hearings.

8. Mr. Brady also abused the discovery process by attempting to hide persons with relevant information contrary to Mr. Brady's view of the tax matter from the Government. Mr. Brady's answers to interrogatories failed to disclose the identities of Ms. Hefflin, Ms. Apt and Ms. Glad, who provided a substantial amount of evidence against him at the evidentiary hearings. At the hearing, Mr. Brady admitted that Ms. Hefflin had a view of the facts pertaining to this case and offered no explanation for failing to include her name in responses to interrogatories. Mr. Brady's failure to disclose these witnesses seriously hampered the Government's trial preparation. *See Diehl v. H.J. Heinz Co.*, 901 F.2d 73, 74–75 (7th Cir.1990) (dismissal of plaintiff's action justified for willful failure to comply with the defendants' request for discovery on a timetable to which plaintiff's lawyer had agreed); *Cf. C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202 (7th Cir.1984) (district court did not abuse its discretion in refusing to vacate default judgment entered when defendants failed to meet

the court's deadline for responding to interrogatories, which deadline had been extended twice by the district court).

9. The conduct the Court finds most offensive is Mr. Brady's perjury at his deposition and the evidentiary hearing. Mr. Brady in bad faith twice failed to comply with his obligation to testify truthfully under oath. After he had been accused by the Government of altering and destroying documents relevant to this litigation, Mr. Brady continued to falsely assert his version of the facts. "False testimony in a formal proceeding is intolerable." *ABF Freight System, Inc. v. N.L.R.B.,* — U.S. —, —, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994); *see Combs v. Rockwell Intern. Corp.,* 927 F.2d 486 (9th Cir.1991) (dismissal with prejudice under Federal Rule of Civil Procedure 11 and court's inherent powers appropriate for falsification of deposition).

10. Mr. Brady has suggested five alternative sanctions to a dismissal of his case and a default on the Government's counter-claim against him. These lesser sanctions include a monetary sanction, barring testimony relating to any documents which the Court finds were improperly destroyed or altered, barring Mr. Brady from arguing or admitting testimony that he did not destroy or alter certain documents which the Court finds were improperly destroyed or altered, barring him from admitting any documents which the Court finds were improperly altered, or barring him from arguing or admitting testimony that his workers were not paid on an hourly basis.

11. The Court has carefully considered each of these lesser sanctions and finds that none would be the proper sanction for Mr. Brady's misconduct. The fact that Mr. Brady perjured himself at the evidentiary hearing on these documents tips the balance here in favor of dismissal. Mr. Brady argues that some of these incidents occurred over eight years ago. However, the perjury did not occur eight years ago. The perjury occurred recently, and the Court views that as a reaffirmation on the part of Mr. Brady of all of the fraudulent acts he committed in the past. The court's conclusion from this repeated behavior is that [Mr. Brady] does not take

[his] oath to tell the truth seriously and that [he] will say anything at any time in order to prevail in this litigation.

*Anheuser–Busch, Inc. v. Natural Beverage Distributors,* 151 F.R.D. 346, 354 (N.D.Cal. 1993) (dismissing defendant's counterclaim under Fed.R.Civ.P. 37 and the court's inherent powers for defendant's failure to produce requested documents, violation of court's orders, and perjury).

12. The Court concludes that dismissal is appropriate here without considering the deterrent effect this might have on other litigants. However, the dismissal of this case will also send a strong message to other litigants who plan to destroy and alter relevant evidence, abuse the discovery process, and then perjure themselves in open court in a continued attempt to slant the facts in their favor. This Court will not condone such behavior by imposing any lesser sanction than dismissal.

> Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means.

*Pope v. Federal Exp. Corp.,* 138 F.R.D. 675, 683 (W.D.Mo.1990), *affirmed in part, vacated in part on other grounds by Pope v. Federal Exp. Corp.,* 974 F.2d 982 (8th Cir.1992).

13. Mr. Brady's conduct is similar to the actions of a plaintiff in another tax case. In *Synanon Church v. U.S.,* 579 F.Supp. 967 (D.D.C.1984), it was found that the plaintiff filed the lawsuit, having willfully destroyed or altered the most probative evidence of its true claim to tax-exempt status, including tapes, a computer inventory, and transcript index. *Id.* at 972, 975. In response to two orders of the court, plaintiff failed to acknowledge its scheme of destruction and concealment of materials it perceived to be damaging. *Id.* at 975. The plaintiff twice represented to the court that the IRS was never denied access to any relevant information. *Id.* Further, plaintiff's "systematic destruc-

tion of tapes and records was contemporaneous with an IRS audit that began in March 1979 and that focused on whether Synanon was a tax-exempt organization." The court found that Synanon had "engaged in a 'deliberately planned and carefully executed scheme to defraud.'" *Id.* (*quoting Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 245, 64 S.Ct. 997, 100, 88 L.Ed. 1250 (1944)). The district court invoked its inherent powers and dismissed plaintiff's action for tax-exempt status.

14. Similarly, dismissal is appropriate in this case. Mr. Brady filed this suit for a tax refund after willfully destroying and altering material evidence following the initiation of the prevailing wage investigation by the Illinois Department of Labor. After being accused by the Government of destroying and altering documents, Mr. Brady lied under oath by denying that he altered and destroyed documents. Further, Mr. Brady failed without justification to reveal to the Government the names of witnesses with information relevant to this matter.

15. Ironically, even though Mr. Brady paid his workers on an hourly basis, that is only one factor of many under the law used to determine whether workers are employees or independent contractors. Based on the evidence admitted, a jury might have found that Mr. Brady's workers were independent contractors. However, it is important to remember that the focus of the Government's Motion and the hearings was Mr. Brady's conduct and not the merits of whether he properly classified his workers as independent contractors. Unfortunately, because of his conduct, the merits of Mr. Brady's claim will never be reached.

### CONCLUSION

For the reasons set forth above, Mr. Brady's Complaint is dismissed with prejudice and default is entered with respect to the Government's counterclaim.

---

1. Lumbermens Mutual Casualty Company was erroneously named in garnishment action as